**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LORI CHAVEZ-DEREMER, ACTING SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR | NO. 24-cv-00190-TJS |
| *Plaintiff,* | CIVIL ACTION |
| vs. | |
| AMAZING CARE HOME HEALTHCARE SERVICES, LLC, CHRISTOPHER KEAR, and JOSEPHINE KILIPKO | |
| *Defendants.* | |

**<u>ORDER</u>**

AND NOW, this _____ day of _____, 2025, upon consideration of Plaintiff's Motion for Summary Judgment and Defendants' Response thereto, it is hereby ORDERED that Plaintiff's Motion is GRANTED in part, and DENIED in part as follows:

1. Plaintiff is GRANTED judgment in its favor that: (a) Home Health Aides ("HHAs") were: (a) misclassified; and (b) were not properly paid at a rate of time and one half.

2. Plaintiff is DENIED judgment in its favor on all remaining claims, as this Court has concluded that there are factual disputes as to:

   a. Independent contractor classification as to Licensed Practical Nurses ("LPNs");

   b. Proper calculations and amounts claimed to be owed to either HHAs or LPNs, which may separately be impacted by a factual dispute concerning "willfulness;"

   c. Whether liquidated damages are warranted; and if so, to what extent (as this Court retains discretion based upon evidence presented);

d.  Whether Plaintiff can establish "willfulness" as required for a 3-year lookback under the FLSA, potentially extending the 2-year statute of limitations;

e.  Whether Kilipko is individually liable under the FLSA and can be deemed an "employer" under the Statute; and

f.  Whether or not injunctive relief is necessary or warranted for alleged recordkeeping violations prospectively (as governing jurisprudence requires a "hearing" on such relief requested, a matter that may not be decided upon summary judgment filings alone).

_____

The Hon. Timothy J. Savage, U.S.D.J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LORI CHAVEZ-DEREMER, ACTING SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR | NO. 24-cv-00190-TJS |
| *Plaintiff,* | CIVIL ACTION |
| vs. | |
| AMAZING CARE HOME HEALTHCARE SERVICES, LLC, CHRISTOPHER KEAR, and JOSEPHINE KILIPKO | |
| *Defendants.* | |

## DEFENDANTS' COUNTERSTATMENT OF FACTS

Defendants, by and through their undersigned counsel, hereby state as follows in their Counterstatement of Facts:

**[1] Amazing Care, Kear's role, and Kear's immigration to the United States**

1.      Kear is (and has been) the President and Administrator of Amazing Care. See Kear Deposition, attached hereto as "Exhibit D," at p. 15.

2.      Kear came to the United States in 1999, attended community college, and became a nurse thereafter. *Id.* at p. 17

3.      Amazing Care became accredited to provide home healthcare services in 2017. *Id.* at p. 72. It is undisputed that this entity provides home-health care services to third-party clients (mostly children) through HHAs and LPNs.[1]

---

[1] The Parties agree Home Health Aides are abbreviated "HHAs" and Licensed Practical Nurses are abbreviated as "LPNs."

**[2]** **Kilipko's immigration to the United States, hire with Amazing Care, and general role within Amazing Care**

4.      Kilipko became a nurse after completing community college around 2010 and later received her bachelor's degree. *See* Kilipko Deposition, attached hereto as "Exhibit E," at pp. 19-20.

5.      Kilipko had only recently come to the United States and held a few different jobs for a short timeframe (pre-Amazing Care employment), working as kitchen staff in a restaurant and for a short time doing some nursing work. Kilipko Dep. at pp. 20-21.

6.      Kilipko began initially working for Amazing Care in 2014 as a nurse pre-formal opening and pre-accreditation. Kilipko Dep. at pp. 14-15.

7.      Prior to working for Amazing Care, Kilipko did not know Kear. Kilipko Dep. at p. 18.

8.      Kilipko was assigned the title of Director of Nursing ("DON") after the prior DON separated in the timeframe of 2016 on a part-time basis and prior to 2020 became full-time when enough work warranted her to work full-time hours. Kilipko Dep. at pp. 24-25.

9.      Kilipko describes her role within Amazing Care as: (a) offering employment and doing criminal background checks (*Id*. at p. 26); (b) sitting through termination meetings conducted by Kear or the Office Manager, *although she doesn't believe she ever directly fired any field employee* (*Id*. at pp. 30-31), as field employees include all HHAs and LPNs (*Id.* at p. 36); (c) handling only patient-related matters and overseeing medical care (*Id*. at p. 38); (d) spending no less than 40 hours per week constantly reviewing HHA or LPN notes and care plans per week to ensure medical compliance (*Id*. at p. 57), in addition to going over care plans at time of assignment with personnel; and, (e) primarily focusing on care plan legal compliance (*Id.* at pp. 57-58).

10.    ***With respect to compensation***, Kilipko explained: (a) Kear gives workers a "base rate sheet" upon hire; (*Id*. at pp. 34-35); and (b) Kear handles determinations on pay rates to workers (*Id*. at pp. 34-35); (c) nobody is hired until Kear sets the compensation rate (*Id*. at p. 35). Kear confirmed he sets all rates of pay (Kear Dep. at pp. 24-25). And the DOL investigator (Nata Mamulashvilli) confirmed not having any recollection of Kilipko being involved with compensation or pay of workers. See Deposition of Nata Mamulashvilli, attached hereto as "Exhibit F," at p. 42. *The record reflects that Kilipko does not handle compensation matters and focuses on medical care and medical compliance, albeit oversight from a nursing standpoint over workers.*[2]

11.    The DOL concluded from records that Kear "is [the] 100% owner" of Amazing Care, and Kilipko has no ownership interest. *See* DOL Report prepared by Nata Mamulashvilli ("Mamulashvilli"), at p. 2, ¶ 1, attached hereto as "Exhibit C."

**[3] There are factual disputes about classification *as to LPNs*.**[3]

12.    Amazing Care is unable to discern if, when, or how much business it will have, *as it relies upon insurance company referrals*. Kilipko Dep. at p. 41.

13.    As to LPNs: (a) they provided their own availability (Kilipko Dep. at p. 42); and (b) they provided how many miles they would travel for assignments. Kilipko Dep. at p. 42.

14.    Amazing Care <u>does not</u> train employees (in any ordinary workplace sense) in how to work in a hired-for role. LPNs come in knowing their role and with nursing licenses already

---

[2] There are factual disputes as to whether Kilipko is even an appropriate individual defendant in this case (as further explained in Defendants' Memorandum of Law, *infra*).

[3] Defendants are disputing misclassification as to LPNs for purposes of summary judgment. Defendants are not disputing having erred in classification as to HHAs. They do however dispute Plaintiff's request for liquidated damages as to all positions <u>and</u> Defendants separately dispute the "willfulness" standard requiring a 3-year lookback period. ***The liquidated damage standard for doubling damages <u>is entirely different</u> than the burden to show willfulness (intentionality) required by Plaintiff to extend a statute of limitations by an extra year (to 3 years).***

(and higher-level education). The DOL in a very misleading fashion, contorts references to "training" in its factual statement (and briefing) - - while unfortunately seeking to capitalize on language barriers and some miscommunication(s) during deposition testimony. The <u>actual</u> record reflects:

a) A provider or insurance carrier provides what is referred to as a care plan to Amazing Care, which defines the exact care and needs of an insurance-referred patient. Kilipko Dep. at p. 48. Kilipko is responsible for ensuring compliance with the care plan by an LPN for a child or patient. *Id*. at p. 49.

b) Per state laws and guidelines, an LPN has to begin implementing the care plan to an assigned patient ***on the same day*** the care plan is implemented. *Id*. at pp. 51-52.

c) On the day in which an LPN meets with Kilipko to start his or her assignment, Kilipko ensures from a medical standpoint that the LPN can in fact do the things listed in the care plan (such as care for a patient with a tracheostomy or someone who needs a feeding tube). *Id.* at p. 46; 53-55; *see also Id.* at pp. 48-49 (I basically make sure LPNs can do what the care plan is requiring). Sometimes, where Kilipko questions a skill of an LPN, she may suggest a specific training module for the LPN to review based on a medical issue in the care plan. *Id*. at p. 47.

15.    The DOL contorts the phrase of "training" in the transcript testimony, when it is clear based upon an actual review of such testimony (in its entirety) that LPNs or HHAs accept an assignment, show up to go over the care plan, and Kilipko verifies the worker can perform the care plan (as legally required). This **<u>is not</u>** tantamount to on-the-job training or a period of, for example, 1-month shadowing to learn a job.[4]

16.    As to LPNs who were classified as independent contractors:

a) They communicated directly with the patients about lateness, not Amazing Care (Kilipko Dep. at pp. 58-59);

b) LPNs never received employee handbooks (Kilipko Dep. at p. 60);

c) LPNs were permitted to use their own subcontractors to perform services to clients they oversaw (Kilipko Dep. at p. 61). Since many clients / patients were children,

---

[4] A trucking company for example that hires a CDL driver and has a safety manager perform a driving test of the driver pre-commencement of work is not training the driver. Such an entity is merely verifying a safe skill set and operational compliance.

Amazing Care just needed to verify subcontractor child abuse clearances (*Id*. at pp. 61-63). LPNs used subcontractors while working for Amazing Care (*Id.* at p. 63);

d) LPNs executed independent contractor agreements and were paid via 1099 and without withholdings (*Id*. at p. 60; 82-83);

e) If a patient / client had a concern, the LPN handled it directly with the patient / client, as opposed to Amazing Care getting involved (*Id.* at p. 64);

f) LPNs were not provided with any equipment, goggles, face barriers, gowns, biohazard bags, gloves, respirators, and had to obtain such PPE, equipment, or products on their own for the job (*Id.* at pp. 68-69). They had to obtain or bring this equipment themselves (*Id.*);

g) LPNs were free to take any time off desired from working for Amazing Care (*Id.* at p. 73);

h) Even the DOL investigator Nata Mamulashvilli ("Mamulashvilli") confirmed it became obvious during the DOL investigation (pre-lawsuit) that LPNs were free to turn down any potential assignments (Mamulashvilli Dep. pp. 39-40; 66);

i) Mamulashvilli confirmed during her DOL investigation (pre-lawsuit) that no LPNs were given any type of company vehicle; and rather, they had to utilize their own personal vehicles (Mamulashvilli Dep. p. 45);

j) Amazing Care doesn't even determine how many hours a particular LPN would be able to work for a client. The Care Plan (created by an insurance company or medical provider), which triggers the potential assignment availability for a client, dictates the exact number of hours the insurance company will pay (and hence allow) for care of the client (Mamulashvilli Dep. at pp. 68-69); and,

k) Despite a conclusion of "misclassification" in the DOL report, Mamulashvilli concluded that workers of Amazing Care are free to work at other companies while performing any assignments for Amazing Care. *See* Exhibit C, at p. 4, ¶ 5.

17.    The DOL makes much ado about a "handbook" as if exemplifying some sort of smoking-gun evidence of "employee" status. First, it was not disseminated to anyone who was classified as an independent contractor (such as LPNs). Kilipko Dep. at p. 60. Second, while Amazing Care may have had 75-100 workers associated with its business (inclusive of HHAs and LPNs), it only had about 6-8 actual office personnel at any given time (Kear (President), Kilipko (DON), an Assistant DON, a biller, a payroll person, a few staffing coordinators, and an office

manager). Kilipko Dep. at pp. 35-36; Kear Dep. at pp. 30-32. Third, without legal consultation and as part of the accreditation process with ACHC, Amazing Care just accepted a template employee handbook and template bylaws prepared by an online business (21st Century). Kear Dep. pp. 48-49; 72.

18.    Many of the LPNs were working through actual corporations for Amazing Care. *See, e.g.*, Exhibit C, at pp. 2-3 (Angela Snowden working through "Moma Loves, LLC," Miatta Borkai working through "Bernice & Blessed Handcare," Adella Sangarie working through "Moniac, LLC"). These are just some of many examples in the record.

19.    If LPNs desired (or needed) to not work or not finish an assignment they chose to accept, other third-party contract agencies worked the day, the week, or the rest of the assignment for said LPN. *See e.g.* Exhibit C, at pp. 11-12.

### **[4] There are immense factual issues as to Plaintiff's purported backpay calculations, as they use the wrong formulas, are overall wrong, and result in hundreds of thousands of dollars in overall inaccuracy.**

20.    The DOL's calculations supporting its claim that Defendants are liable for $5,919,096.34 in unpaid overtime wages are flawed.  A review of a sample of the affected individuals who were allegedly underpaid by the highest amounts demonstrates the glaring problems with the DOL's calculations.  The DOL's Revised Schedule A contains a list of total alleged damages owed to each individual, which Defendants have sorted by amount of alleged damages owed. *See* Plaintiff's Revised Schedule A, Damages Summary, attached hereto as "Exhibit A." Comparing the information pulled from Defendants' timecards and using simple math results in damages numbers far lower than those listed in this Revised Schedule A.  Reviewing DOL's calculations for the individual with the highest alleged damages reveals the gross discrepancies in the DOL's calculations.

21.    First, the DOL did not bother rounding to actual monetary amounts in its calculations. The very first entry in the DOL's Revised Schedule A is $356,058.**548**. *See* Exhibit A, at p. 1. There is no such thing as a monetary amount with more than two (2) decimal points. According to the DOL, some of the individuals are allegedly owed amounts with **five (5) decimal points**. *Id.* The DOL compounded this error by failing to round for **almost every person** in its calculations. *Id.* This absurdity on its own calls into question that the damages totals are "undisputed."

22.    Moving on to the DOL's calculations themselves (*which are the most glaring concern of all*), they suffer from a very basic problem – the DOL failed to show its work – which resulted in calculations for individuals *that are off by as much as tens of thousands of dollars.* Take the individual who, according to the DOL, has the highest alleged damages. The DOL claims that Marie Lewis (identified as "At Home Assisted Living") (hereafter, "Ms. Lewis") is owed $356,058.548 in unpaid overtime. *See* Exhibit A, p. 1. The Defendants checked the DOL's work, and this number is wildly inflated. *See* Defendants' Damages Calculations for Marie Lewis, attached hereto as "Exhibit B."

23.    Defendants based their calculations by taking data directly from their payroll records. Column A represents the pay date for each biweekly pay period. Column B is the number of hours worked for the respective bi-weekly pay period. The total number of hours worked in Column B is then divided into straight time hours in Column E and overtime hours in Column G. Column C represents the amount that the individual was paid for the biweekly pay period. The step-by-step calculation, using the entries for the bi-weekly pay date of December 31, 2020, follows as such:

1) The regular rate of pay in Column D is calculated by dividing the total amount paid in Column C by the number of hours worked in Column B. ($6,944.00 / 224 hours = $31/hour regular rate of pay).

2) Column F shows the amount earned for straight time work by multiplying the regular rate of pay in Column D by the number of straight time hours worked in Column E. ($31/hour x 80 hours = $2,480.00 straight time earnings).

3) Column H shows the amount of overtime earned by multiplying the regular rate of pay in Column D by an overtime premium of 1.5 and then by the number of overtime hours worked in Column G. ($31/hour x 1.5 overtime premium x 144 overtime hours = $6,696.00 overtime earnings).

4) Finally, the amount of unpaid overtime in Column I is calculated by adding the straight time earnings in Column F to the overtime earnings in Column H, and then subtracting the amount that was actually paid in Column C. ($2,480.00 straight time earnings + $6,696.00 overtime earnings - $6,944.00 already paid = $2,232.00).

24.    Even if the DOL can establish that that Defendants committed a "willful" violation (a burden necessary to extend to a 3-year statute of limitations), which would allow the DOL to seek damages back to July 13, 2020, the total amount of unpaid overtime during that time period is only $247,223.32 based on Defendants' calculations. *See* Exhibit B, at p. 4. This is a discrepancy of **$108,835.23** as compared to the DOL's calculations, and this is **for only one person**. The discrepancy is even more pronounced if DOL fails to prove tolling and/or willfulness. *Id.* at p. 4.[5]

---

[5] These calculation errors are across-the-board, and Defendants dispute all of the DOL's calculations for each and every past worker of Defendants. If Plaintiff attempts to double-down in a Reply instead of correcting its calculations, Defendants will seek leave to file a Sur-Reply to provide many more examples.

**[5]  Plaintiff is unable to show the absence of good faith for an award of liquidated damages or able to establish the much higher burden of "willfulness" to increase the statute of limitations by an entire year.**[6]

25.    Neither Kilipko, nor Kear, had ever been involved in any prior litigation (or had been deposed in any matter). Kilipko Dep. at p. 8; Kear Dep. at p. 6.

26.    Neither Kilipko, nor Kear, had ever been contacted or audited by the DOL prior to an investigation leading to this lawsuit. Kilipko Dep. at p. 23; Kear Dep. at pp. 21-22.

27.    Kear worked for a home-healthcare company for about 12 years before opening Amazing Care, and he was never paid for overtime there and was only paid straight time (Kear Dep. at p. 18-21). At his prior company, he was treated for over a decade as an independent contractor. *Id*. at p. 21; *see also Id*. at p. 83 (during any of my working years in the same industry, there was never any overtime paid and many companies I am familiar with run in the same manner as Amazing Care).

28.    Kear never opened, operated, or managed his own business before Amazing Care. Kear Dep. at pp. 18-19.

29.    Kilipko has the reasonable belief that independent contractors are not entitled to overtime pay. Kilipko Dep. at p. 85. In fact, when testifying on January 14, 2025, during his deposition, Kear explained he has now consulted several lawyers (post legal claims) and still isn't clear that his workers can't be independent contractors by law. Kear Dep. at p. 67.

---

[6] It is **extremely reasonable** that Kear thought no employees were entitled to overtime. Plaintiff would have this court believe that it is obvious or common knowledge that everyone in home health care is entitled to overtime. ***Well, it was not that way for almost 80 years under the FLSA***. The FLSA was signed into law and became effective on October 24, 1938. In *Home Care Ass'n of Am. v. Weil*, 799 F.3d 1084, 1089 (D.C. Cir. 2015), the court explained legislation went into effect in 2015 amending the FLSA to – for the first time – require home healthcare companies to pay overtime to "employees." Due to litigation, the requirement to pay overtime to home-health "employees" did not become effective until 2016. The home-health care exemption to overtime was thus removed only in the last approximate 10 years. *Thus, when Kear opened his own business, he fashioned in the same manner as all other businesses operated from what he understood while working in home health care.* Until the last decade, Amazing Care workers would not have been entitled to overtime if properly considered hourly "employees."

30.    The Accreditation Commission for Health Care, Inc. ("ACHC") accredits, audits, and directs on home-healthcare standing and compliance. During accreditation and auditing, ACHC never informed Amazing Care of any concerns with their payroll or overtime obligations. Kear Dep. p. 71-76; Kilipko Dep. p. 13.

31.    As soon as the DOL investigator had contact with Kear and Kilipko during the (pre-lawsuit) DOL investigation and throughout the investigation (where they were unpresented by counsel), Mamulashvilli (the DOL investigator) explained: (a) they were very "cooperative" (Mamulashvilli Dep. at pp. 25; 33; 36; 47); (b) nobody tried to misrepresent anything during the investigation (*Id*. at p. 36); (c) Amazing Care kept "accurate records of employee hours worked" (*Id*. at p. 47); (d) there was *not a single discrepancy* in any hours worked from Amazing Care's recordkeeping (*Id*. p. 48); (e) she never saw any communications or evidence to form the opinion Amazing Care willfully intended to violate the FLSA (*Id*. p. 50); (f) Kear and Kilipko exhibited a genuine intent to make sure they were in compliance at each meeting with the DOL (*Id.* at pp. 45-46); (g) it was clearly a mitigating factor that Amazing Care had never had any contact with, investigation by, or negative finding from the DOL previously (*Id*. at p. 53); and, (h) even without counsel, Kear and Kilipko still thought they didn't misclassify people even after having been explained the DOL's position (*Id*. at pp. 75; 79).

Respectfully submitted,

**KARPF KARPF & CERUTTI P.C.**

*/s/ Benjamin Salvina*
Benjamin Salvina, Esq.
Ari R. Karpf, Esq.
Karpf, Karpf & Cerutti, P.C.
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053
bsalvina@karpf-law.com

Dated: June 20, 2025

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LORI CHAVEZ-DEREMER, ACTING
SECRETARY OF LABOR, UNITED
STATES DEPARTMENT OF LABOR

    *Plaintiff,*

    vs.

AMAZING CARE HOME HEALTHCARE
SERVICES, LLC, CHRISTOPHER KEAR,
and JOSEPHINE KILIPKO

    *Defendants.*

NO. 24-cv-00190-TJS

CIVIL ACTION

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINITFF'S MOTION FOR SUMMARY JUDGMENT

Defendants, by and through their undersigned counsel, hereby state as follows in their

Memorandum in Opposition to Summary Judgment:[7]

---

[7] Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, "a court does not resolve factual disputes or make credibility determinations, and must view facts and inferences in the light most favorable to the party opposing the motion." *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

The moving party bears the burden of proving that no genuine issue of material fact is in dispute. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970). A genuine issue is established if a reasonable jury could return a verdict for the non-moving party based on the evidence presented. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-49, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

"[O]n summary judgment, the inferences to be drawn from the underlying facts … must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587-588 (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)). "If reasonable minds can differ as to the import of proffered evidence that speaks to an issue of material fact, summary judgment should not be granted." *Gelover v. Lockheed Martin,* 971 F.Supp. 180, 181 (E.D.Pa.1997).

**[1] Introductory Statement Regarding DOL Handling Of this Case**

If ever the phrase fit of "mailing it in," it does so here, *as the DOL conclusively mailed this one in*. The DOL's entire case against Defendants is premised upon: (a) relying on some notes from a DOL investigator taken many years ago; (b) two (2) very quick and cursory depositions of Kean and Kilipko (the President and DON of Amazing Care), where not a single employee was discussed; (c) a short declaration by the DOL investigator; and (d) creating a sum total from payroll records of $5,919.096.34 alleged owed in unpaid overtime (for which it seeks a multiplier of x 2 for liquidated damages). This minimal effort and time expended results in nothing but conclusions and generalities to garner support for its Motion contents.

The DOL made no effort whatsoever by failing to, *inter alia*: (1) present or obtain testimony from a single current or former employee; (2) even differentiate anything between HHAs or LPNs during the case or for this Court upon summary judgment; or, (3) discuss, analyze, or mention any specific employee, contractor, corporate entity paid by Amazing Care (for which it claims was an employee entitled to overtime). On top of these obvious shortcomings, the DOL provided an inaccurate and poorly prepared spreadsheet of damages with improper formulas and calculations.

**[2] It is a fact question as to whether or not LPNs providing work for Plaintiffs were in fact "employees" (as asserted by Plaintiff) as opposed to independent contractors.**

The FLSA's overtime protections extend only to employees within the meaning of the Act, and do not apply to independent contractors. *Scantland v. Jeffry Knight, Inc*., 721 F.3d 1308, 1311 (11th Cir. 2013); *Brock v. Superior Care, Inc*., 840 F.2d 1054, 1058 (2d Cir. 1988)(Independent contractors are not covered by the FLSA).

In *Sec'y of Labor v. Caring First, Inc*., 2017 U.S. Dist. LEXIS 237621, at *2 (M.D. Fla. 2017), the United States Department of Labor ("DOL") moved for summary judgment against a

home-health care company as to LPNs and care workers on independent contractor status. In denying summary judgment, the court explained:

- Staff was free to reject assignments <u>without consequence</u> and were not terminated for declining assignments in any period of time, and the DOL failed to present any evidence "as to the frequency with which Defendants exercise supervisory rights" as only set forth in a conclusory manner. *The court explained it cannot make a determination about "**employer's control**" where the <u>DOL fails</u> to clearly outline details of management control and "frequency" of such control. Id.* at ** 9-10

- Staff was free to "accept or decline work as one saw fit," and pay differed per assignment or through negotiation. *Moreover, the DOL failed to present any evidence whatsoever on how many staff members worked for other agencies in addition to Defendant preventing the Court from even determining "**opportunity for profit or loss**." Id.* at ** 12-13.

- If a staff member provides any of their own equipment, this factor (***investment in equipment***) weighs in favor of finding independent contractor. *Id.* at * 13.

- Where staff members obtain their own licensing and learn skills to perform his or her job before working for the defendant, this factor weights in favor of finding independent contractor status (***as to special skills***). *Id.* at * 14.

- The DOL failed to present any evidence to the court about what percentage of any worker's revenue even comes from the defendant to even determine if the "***duration of the working relationship***" matters - - making the factor "neutral" at most. *Id.* at ** 15-16.

In *Figuera v. All VIP Care Inc.*, 2023 U.S. Dist. LEXIS 156448, at *12 (S.D. Fla. 2023), a home health aide sued a business that hired her as an independent contractor to provide home-health care for an insured client. The defendant: (a) <u>as in this case</u>, had the insurer authorize the number of hours permitted for work; (b) had the plaintiff execute an independent contractor agreement; (c) care plans were created and established by a provider or insurance company; (d) workers were free to reject assignments; and, (e) nothing prohibited work elsewhere. *Id.*

In *Figueroa*, the court denied the plaintiff's motion for summary judgment explaining regardless of how many hours worked, it was a fact question as to whether the plaintiff was truly economically dependent upon the defendant. *Id* at * 13. Moreover, the court explained "a

reasonable jury could find that Plaintiff controlled her own work and that Defendants merely acted as a middleman between Plaintiff, the client, and the client's insurance company." *Id.*

Even post-amendment to the FLSA in the last 10 years rendering home-health workers entitled to overtime (as had not been the case since the 1930s), courts do not hesitate to find that home health care workers (fact dependent of course) can constitute legitimate independent contractors. *See also Badon v. Berry's Reliable Res., LLC,* 2021 U.S. Dist. LEXIS 126056, at *1 (E.D. La. 2021)(denying plaintiffs' motion for summary judgment in FLSA case explaining there were factual questions as to whether their work as a home-health caregivers was truly on an independent contractor basis, as they signed independent contractor agreements and absorbed some expenses associated with performance of work); *People ex rel. DOL v. MCC Home Health Care, Inc*., 339 Ill. App. 3d 10, 15 (Ill. App. Ct. 2003)(finding summary judgment inappropriate *while applying federal FLSA jurisprudence* in explaining fact questions remain in independent contractor analysis of home-health care worker overtime claims).

As to the independent contractor factors, they "are non-exhaustive, and no individual factor is controlling." *Scantland v. Jeffry Knight, Inc.,* 721 F.3d 1308, 1312 n.2 (11th Cir. 2013); *Brock v. Superior Care, Inc*., 840 F.2d 1054, 1059 (2d Cir. 1988)("No one of these factors is dispositive; rather the test is based on a totality of the circumstances."). And Defendants present a very strong factual dispute asserting, *inter alia*:

- Amazing Care is unable to discern if, when, or how much business it will have, as it relies upon insurance company referrals. Kilipko Dep. at p. 41.

- As to LPNs: (a) **they provided their own availability** (Kilipko Dep. at p. 42); and (b) **they provided how many miles they would travel for assignments**. Kilipko Dep. at p. 42.

- Amazing Care **does not train** employees (in any ordinary workplace sense) in how to work in a hired-for role. LPNs come in knowing their role and with nursing licenses already (and higher-level education).

- **LPNs communicated directly** with the patients about lateness, not Amazing Care (Kilipko Dep. at pp. 58-59).

- LPNs **never received employee handbooks** (Kilipko Dep. at p. 60).

- LPNs were **permitted to use their own subcontractors** to perform services to clients they oversaw (Kilipko Dep. at p. 61).

- LPNs **executed independent contractor agreements** and were paid via 1099 and without withholdings (*Id.* at p. 60; 82-83).

- If a patient / client had a concern, **the LPN handled it directly** with the patient / client, as opposed to Amazing Care getting involved (*Id.* at p. 64).

- LPNs **were not provided** with any equipment, goggles, face barriers, gowns, biohazard bags, gloves, respirators, and had to obtain such PPE, equipment, or products on their own for the job (*Id.* at pp. 68-69). They had to obtain or bring themselves (**expenses of the LPN**).

- LPNs were **free to take any time off** desired from working for Amazing Care (*Id.* at p. 73).

- Even the DOL investigator Nata Mamulashvilli ("Mamulashvilli") confirmed it became obvious during the DOL investigation (pre-lawsuit) that **LPNs were free to turn down any potential assignments** (Mamulashvilli Dep. pp. 39-40; 66).

- Mamulashvilli confirmed during her DOL investigation (pre-lawsuit) that no LPNs were given any type of company vehicle; and rather, **they had to utilize their own personal vehicles** (Mamulashvilli Dep. p. 45).

- **Amazing Care doesn't even determine how many hours a particular LPN would be able to work for a client**. The Care Plan (created by an insurance company or medical provider), which triggers the potential assignment availability for a client, dictates the exact number of hours the insurance company will pay (and hence allow) for care of the client (Mamulashvilli Dep. at pp. 68-69).

- Despite a conclusion of "misclassification" in the DOL report, Mamulashvilli concluded that workers of Amazing Care **are free to work at other companies while performing any assignments for Amazing Care**. *See* Exhibit C, at p. 4, ¶ 5.

- Many of the LPNs were working through actual corporations for Amazing Care. *See e.g.* Exhibit C, at pp. 2-3 (Angela Snowden working through "Moma Loves,

LLC," Miatta Borkai working through "Bernice & Blessed Handcare," Adella Sangarie working through "Moniac, LLC"). These are just some of many examples in the record.

- If LPNs desired (or needed) to not work or not finish an assignment they chose to accept, other third-party contract agencies worked the day, the week, or the rest of the assignment for said LPN. *See e.g.* Exhibit C, at pp. 11-12.

Again, the DOL (Plaintiff) basically mailed this case in and exerted minimal effort in attempting to build a record, establish any details, and attempts to obtain a favorable judgment on generic deposition questions about policies, applications, and payroll. But these issues are very fact intensive. And any reasonable factfinder could conclude that LPNs were in fact independent contractors.[8]

**[3] It is a fact question whether or not liquidated damages are warranted.**

29 U.S.C. § 260 provides that a "court may, **in its sound discretion**, award no liquidated damages or award any amount thereof" up to the double damages contemplated by § 216. (Emphasis added). Section 260 ***permits a court to decline or limit*** liquidated damages "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]." The employer's burden is "plain and substantial." *Martin v. Cooper Elec. Supply Co*., 940 F.2d 896, 907 (3d Cir. 1991).

Plaintiff would have this court believe that *it is <u>obvious</u>* or common knowledge that everyone in home health care is entitled to overtime. Well, it was not that way for almost 80 years under the FLSA. The FLSA was signed into law and became effective on October 24, 1938. In *Home Care Ass'n of Am. v. Weil*, 799 F.3d 1084, 1089 (D.C. Cir. 2015), the court explained

---

[8] In fact, at trial, it is also possible that a jury could find that many LPNs were independent contractors, while some were possibly not. This is the problem with the DOL failing to address anything in detail or even as to a specific person or corporation providing contract services as an LPN.

legislation went into effect in 2015 amending the FLSA to – for the first time – require home health companies to pay overtime to "employees." Previously, straight time or non-payment of overtime was perfectly legal (unless of course someone was an independent contractor - - requiring a different analysis).

Due to litigation, the requirement to pay overtime to home-health "employees" did not become effective until 2016. The home-health care exemption to overtime was thus removed only in the last approximate 10 years.

In Section 5 of Defendants' Counterstatement of Fact, Defendant set forth ***many*** reasons why there was an absence of bad faith (including having been audited by their accreditation agency with out issue and a host of other reasons). *See e.g. Blan v. Classic Limousine Transp., LLC*, 2021 U.S. Dist. LEXIS 59239, at *26 (W.D. Pa. 2021)(declining to grant summary judgment for liquidated damages explaining since other agencies reviewed defendant and did not turn up any issues with independent contractor characterization, the employer sufficiently established enough "good faith" to avoid liquidated damages despite misclassifying employees as independent contractors); *Nepomuceno v. Amsterdam Deli & Convenience Corp.*, 2022 U.S. Dist. LEXIS 172862, at *25 (S.D.N.Y. 2022)(declining to grant summary judgment on liquidated damages because even where a defendant concedes a failure to consult counsel or an accountant, the defendant may still present other evidence showing a good-faith belief);

**[4]  There are fact questions as to whether Kilipko is an "employer," subject to individual liability.**

"The FLSA imposes individual liability on 'any person acting directly or indirectly in the interest of an employer in relation to an employee.'" *Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 153 (3d Cir. 2014) (quoting 29 U.S.C. § 203(d) of the FLSA). "A company's owners, officers, or supervisory personnel may also constitute 'joint employers' for purposes

of liability under the FLSA." *Id.* Liability exists when the individual exercises "supervisory authority over the complaining employee **and was responsible in whole or in part for the alleged violation** while acting in the employer's interest." *Id.* (quoting *Haybarger v. Lawrence Cnty. Adult Prob. & Parole*, 667 F.3d 408, 417 (3d Cir.2012))(emphasis added).

An individual has supervisory authority "when the supervisor independently exercises control over **the work situation**." *Id.* (emphasis added). The "focus is on 'the totality of the circumstances rather than on the technical concepts of the employment relationship.'" *Id.* at 154 (quoting *Haybarger*, 667 F.3d at 418).

In *Diaz v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 2011 U.S. Dist. LEXIS 167003, at *14 (S.D. Tex. 2011), the court dismissed assertions of individual liability under the FLSA against 2 daily managers of the plaintiff. In doing so, the court explained:

- These managers "did not decide . . . rate or method of payment." *Id.* at * 10.

- These managers "lacked the ability to authorize compliance with the FLSA." *Id.* at * 11.

- These managers did not control "overtime wages" and had "no involvement in . . . exempt classification." *Id.* at * 14.

In *Diaz*, the court explained there were many things the 2 managers did to "act as her employer" in various respects (with examples in the holding), but emphasized: "Congress **never intended** to make each individual manager and officer with a business, public or private, personally liable for violations of the FSLA, **when a manager or officer cannot control** the very things which may lead to violation of the FLSA. *Id.* at * 14 (emphasis added).

In *Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668, 678 (1st Cir. 1998), the court explained **the DOL's attempted interpretation of the FLSA was too broad** (as the DOL was asserting anyone with day-to-day oversight of management or operations must be deemed an "employer"). In *Baystate*, the Court of Appeals reversed a holding that management was

individually liable explaining even though individuals exercise supervisory control over the workers, it must be proven they "control the purse strings" **as it relates to the specific violation** alleged under the FLSA.[9]

In *Pineda v. Skinner Servs.*, 2020 U.S. Dist. LEXIS 177867, at *70 (D. Mass. 2020), the court dismissed individual liability claims under the FLSA against a field manager who managed day-to-day operations and employees, set scheduling, and had many other high-level management responsibilities. In doing so, the court explained to be individually liable under the FLSA for an overtime claim, the manager must have made the decisions about compensation and control the purse strings. *Id.* at * 73-74

Plaintiff takes a very generalized and categorical view that Kilipko was a "Director of Nursing" and oversaw employees as to their care of in-home clients – and thus – meets the expansive definition of an "employer." But the record does not support such a generalized conclusion and is vague at best. *See also e.g. Wells v. Steraloids, Inc.*, 2020 U.S. Dist. LEXIS 60066, at *1 (D.R.I. 2020)(dismissing individual liability assertions against human resources manager who oversaw payroll and handled financial matters with nursing staff, explaining the plaintiff presented no clear factual allegations in her complaint about this manager having "control" over compensation decisions, control over "financial resources," or control over corporate "purse-strings;"[10] *see also Cai v. Fishi Cafe, Inc.,* 2007 U.S. Dist. LEXIS 73764, at *16

---

[9] If an employee pursues retaliatory termination under the FLSA, it will need to be established that the asserted manager had control over the termination. If an employee pursues non-overtime pay or misclassification, it must be established that the asserted manager had some authority over classification or compensation. Otherwise, every supervisor would be liable as overseeing day-to-day operations (regardless of involvement in the specific legal issue at hand). Is a manager who is on medical leave for 2 weeks liable for terminating an employee who complains of overtime violations during his absence and who is fired (just because that manager managed the employee's daily work for years)?

[10] "Status as a corporate officer" does not even automatically mandate individual liability under the FLSA. *Olivas v. A Little Havana Check Cash, Inc*., 324 Fed. Appx. 839 (11th Cir. 2009). Even a shareholder involved with a business

(N.D. Cal. 2007)(This court does not believe Congress intended to make every manager overseeing daily operations liable under the FLSA where he or she had no control over the actual FLSA issue alleged or lacked control to adjust compensation, finding it to be factual issue about individual liability for trial).

In Section 2 of Plaintiff's Counterstatement of Facts, she outlines that she, Kear, and the DOL investigator all testified she didn't handle pay or compensation of employees (despite managing such employees daily as to level of medical care and compliance with care plans).

**[5] Plaintiff is not entitled to "injunctive relief."**

District Courts are authorized to issue injunctions to restrain violations of the FLSA when cause is shown that such an injunction is necessary. 29 U.S.C. § 217. When determining whether an injunction might be necessary, courts consider: "(1) 'the employer's past conduct'; (2) the employer's **'current** conduct'; and (3) 'most importantly, whether the employer can be counted on to comply with the FLSA **in the future**." *See Pizzella v. Empire Diner*, 2021 U.S. Dist. LEXIS 80852, at *27 (E.D. Pa. 2021)(emphasis added).

Plaintiff offers no representations of current or future conduct, as it could not in this case anyway. It only offers information about what happened from 2020 – 2024. In *Pizzella*, the court explained that trial courts **are prohibited on a summary judgment record** from issuing injunctive relief. *Id.* at * 27-28. Such relief requires *an independent hearing* concerning anticipated future conduct and other relevant matters. *Id* (citing other jurisprudence in this district).

In *Walsh v. Trimed Healthcare, LLC*, 2022 U.S. Dist. LEXIS 140261, at *14 (E.D. Pa. 2022), the court denied injunctive relief to the DOL pursuing a class action at the summary

---

is not automatically liable under the FLSA by virtue of his or her title or role. *Mancilla v. Chesapeake Outdoor Servs*., LLC, 2023 U.S. Dist. LEXIS 88011, at *11 (D. Md. 2023).

judgment stage explaining such relief is in the "discretion" of the court, and such relief requires "factual findings" about "whether the employer can be counted on to comply with the [Act] **in the future" and after a hearing**.

It also seems like somewhat of an absurd ask on the part of the DOL to just include such a template request in the body of its Motion when: (a) injunctions are not permitted by way of a summary judgment motion; and, (b) the facts do not warrant such a template request by an agency anyway.

As soon as the DOL investigator had contact with Kear and Kilipko during the (pre-lawsuit) DOL investigation and throughout the investigation Mamulashvilli (the DOL investigator) explained: (a) they were **very "cooperative"** (Mamulashvilli Dep. at pp. 25; 33; 36; 47); (b) nobody tried to mispresent anything during the investigation (*Id*. at p. 36); (c) **Amazing Care kept "accurate records of employee hours worked**" (*Id*. at p. 47); (d) **there was not a single discrepancy in any hours worked from Amazing Care's recordkeeping** (*Id*. p. 48); and, (e) Kear and Kilipko exhibited a genuine intent to make sure they were in compliance at each meeting with the DOL (*Id*. at pp. 45-46). Moreover, the record reflects compliance with the FLSA post-lawsuit filing.

Thus, there are many reasons why Plaintiff's assertion about seeking injunctive relief does not appear necessary and would warrant an evidentiary basis (at a hearing) to support injunctive relief in a more proper and procedurally correct manner.

**[6] <u>Summary Judgment cannot be granted upon Plaintiff's record-keeping claim because the sole relief is injunctive relief.</u>**

The FLSA provides employees with a private right of action to recover unpaid minimum wages or unpaid overtime compensation from their employer. 29 U.S.C. § 216(b). However, this right of action does not entitle private employees to bring independent claims against their

employers for failing to keep accurate records required by 29 U.S.C. § 211(c) and 29 C.F.R. Part 516.

Rather, the authority to enforce the record-keeping provisions in 29 U.S.C. § 211(c) is exclusively given to the Secretary of Labor, not employees. *See* 29 U.S.C. § 217 (granting district courts jurisdiction **to enjoin violations** of 29 U.S.C. § 211(c)); *Powell v. Florida*, 132 F.3d 677, 678 (11th Cir. 1998)(explaining "the right to bring **an action for injunctive relief** under the Fair Labor Standards Act [§ 217] rests exclusively with the United States Secretary of Labor")

Plaintiff agrees that the DOL is permitted to seek injunctive relief, the only relief available for an asserted record-keeping violation. But because such a claim is intertwined with the sole relief *of an injunction* (requiring an analysis upon concern with future compliance), a hearing is warranted (should the DOL maintain such a non-damages based allegation and claim). The sole relief for an alleged record keeping violation by the DOL is "injunctive relief." *Acosta v. Las Margaritas, Inc*., 2018 U.S. Dist. LEXIS 216549, at *8 (E.D. Pa. 2018). And as outlined supra, the DOL cannot be granted injunctive relief based upon summary judgment filings.

### [7] **Summary Judgment cannot be granted as to Plaintiff seeking a 3-year lookback period**

The DOL initiated the instant lawsuit on January 16, 2024 (*See* Docket Entry # 1). A tolling agreement had been entered into between the DOL and Defendants whereby if the DOL filed a lawsuit "after January 15, 2024," the lawsuit – by agreement of the Parties – "shall be deemed to have been filed 187 days prior to the actual filing date." See Tolling Agreement, attached hereto as "Exhibit G." The DOL imprecisely sets forth the starting period of "July 13, 2020" for a lookback period *when it should be July 14, 2020* (if it were to meet the burden of proving willfulness).

The governing statute of limitations for FLSA claims of failure to pay overtime wages is two (2) years, **underlined** the violation is willful, in which case the period is three (3) years. 29 U.S.C §255(a). Plaintiff bears the burden of proof. *Jackson v. Art of Life*, 836 F.Supp.2d 226 (E.D. Pa. 2011). To apply the three (3) year statute of limitations, Plaintiff must prove willfulness through evidence Defendants "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the FLSA." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S. Ct. 1677, 100 L. Ed. 2d 115 (1988).

Citing only third circuit jurisprudence, the court in *Stansbury v. Faulkner,* 443 F. Supp. 3d 918, 935 (W.D. Tenn. 2020) explained: "The willfulness determination **is a question of fact.** A District Court should only answer the question as a matter of law when there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party," (*citing Souryavong v. Lackawanna Cty.*, 872 F.3d 122, 126 (3d Cir. 2017) and *Taha v. Bucks Cty. Penn.*, 367 F. Supp. 3d 320, 333 (E.D. Pa. 2019)) (emphasis added).

The holding in *Souryavong v. Lackawanna Cty.*, 872 F.3d 122, 126 (3d Cir. 2017) is very instructive (*as well as binding*). Therein, the Court in *Souryavong* explained:

- "willfulness" under the FLSA is normally a "question of fact." *Id*. at 126

- "Acting only unreasonably" as an employer "is insufficient" to establish willfulness. *Id.*

- Actual "awareness" of wrongdoing must be established to engage in a willful violation. *Id.*

- Ongoing overtime violations for years, questions by employees about overtime, and general awareness of the FLSA isn't even sufficient to establish "willfulness." *Id*

- To exemplify the exceedingly high burden of proof (which nearly mirrors a punitive damage standard), the Court cited to *Flores v. City of San Gabriel,* 824 F.3d 890, 896, 905-07 (9th Cir. 2016), explaining even 9 years of misclassification by an employer isn't sufficient to grant summary judgment to a plaintiff for willfulness under the FLSA. *Id.*

- The Court explained it was not an error for the district court to award liquidated damages <u>and to deny</u> a 3-year statute of limitations on willfulness because "a lack of evidence going to good faith [for liquidated damages] ***is not the same*** as evidence in support of intentionality [to extend a statute by an extra year for willfulness]. *Id*. at 127.

Defendants had no management or business experience, and they paid employees the same way they were paid in the industry merely mirroring the business model they previously worked within. There is no evidence they knew of a change in law (as nobody in home healthcare was entitled to overtime prior to 2016), they couldn't afford counsel or an accountant when starting the business, and they are both immigrants who came to the United States and just worked in labor roles and went to school before opening Amazing Care. Plaintiff's own lead investigator admitted she saw ***no evidence to reflect any willful intent***.

As set forth above, it is a very high burden to establish the requisite intent to knowingly violate the FLSA. *See also e.g. Lincoln v. Apex Human Servs. LLC*, 2022 U.S. Dist. LEXIS 115639, at *6 (E.D. Pa. 2022) (dismissing attempt to amend twice (at the pleading stage) to seek 3-year statute of limitations for willfulness against home-health care company for misclassifying as independent contractors as in this case explaining the "willful" 3-year standard is much harder to prove).

<u>Conclusion</u>

For the reasons outlined *supra*, Defendants respectfully request that this Honorable Court enter the proposed ORDER affixed to Defendants' response.

Respectfully submitted,

**KARPF KARPF & CERUTTI P.C.**

*/s/ Benjamin Salvina*
Benjamin Salvina, Esq.
Ari R. Karpf, Esq.
Karpf, Karpf & Cerutti, P.C.
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053
bsalvina@karpf-law.com

Dated: June 20, 2025

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LORI CHAVEZ-DEREMER, ACTING SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR | NO. 24-cv-00190-TJS |
| *Plaintiff,* | CIVIL ACTION |
| vs. | |
| AMAZING CARE HOME HEALTHCARE SERVICES, LLC, CHRISTOPHER KEAR, and JOSEPHINE KILIPKO | |
| *Defendants.* | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of Defendants' Opposition to Summary

Judgment was served upon all counsel of record via this Court's CM/ECF system.

*/s/ Benjamin Salvina*
Benjamin Salvina, Esq.

Dated: June 20, 2025