IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LORI CHAVEZ-DEREMER, Secretary of Labor, United States Department of Labor | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| AMAZING CARE HOME HEALTHCARE SERVICES, LLC, CHRISTOPHER KEAR and JOSEPHINE KILIPKO | : | NO. 24-190 |

## MEMORANDUM OPINION

Savage, J.                                                    February 13, 2026

The Department of Labor ("DOL")[1] brought this action under the Fair Labor Standards Act ("FLSA") against defendants Amazing Care Home Healthcare Services, LLC ("Amazing Care"), a home healthcare provider, and its owner Christopher Kear and Director of Nursing Josephine Kilipko, accusing them of willfully misclassifying employees as independent contractors to avoid paying overtime wages. It also alleges they failed to keep sufficient employment records.

The DOL moves for summary judgment, asserting the undisputed facts prove that Amazing Care is a covered enterprise under the FLSA, Kear and Kilipko are individually liable as employers, and the healthcare workers at issue are employees owed overtime pay. It contends the undisputed facts prove that the defendants willfully violated FLSA overtime and recordkeeping provisions, are liable for liquidated damages, and owe $5,919,096.34 in back overtime wages. It also moves for injunctive relief.

---

[1] At the time this action was filed, the named plaintiff was Acting Secretary of Labor Julie A. Su. The current Secretary of Labor, Lori Chavez-DeRemer, has since been substituted as plaintiff. *See* Fed. R. Civ. P. 25(d).

The undisputed facts establish that Amazing Care is a covered entity under the FLSA; each of the defendants is jointly liable as an "employer"; Amazing Care's home health aides and licensed practical nurses are "employees" owed overtime pay; and the defendants violated FLSA recordkeeping requirements.  We further find that liquidated damages are warranted to the extent the defendants are liable for overtime violations.

## Background

Amazing Care is a Pennsylvania limited liability company that provides in-home medical care.[2]  Approximately 95 percent of its patients are children.[3]  During the relevant period, defendant Christopher Kear was Amazing Care's owner, President, and Administrator.[4]  He determined when Amazing Care would recruit new staff, had final say over hiring and firing decisions, set pay rates and conditions of employment, made payroll decisions, and authorized payroll payments.[5]  Defendant Josephine Kilipko, Amazing Care's Secretary and Director of Nursing,[6] oversaw nursing care, and was involved in hiring, training, and firing staff.[7]

To determine a patient's plan of treatment, Amazing Care contacted the patient's parents to confirm staffing needs and preferences.[8]  Kilipko then assigned a licensed

---

[2] Sec'y of Lab.'s Statement of Undisputed Material Facts ["Pl.'s SUMF"] ¶ 1, ECF No. 41-1. The defendants did not submit a statement of facts that addressed the DOL's Statement of Undisputed Facts. When a party fails to dispute another party's assertions of fact, those facts can be considered undisputed. Fed. R. Civ. P. 56 (c)(1), (e)(2).  The facts from the DOL's Statement of Undisputed Facts cited in this Opinion are not materially disputed by the defendants in their briefing and are supported by the record.

[3] Dep. Tr. of Josephine Kilipko (attached as Ex. C to Sec'y of Lab.'s Mem. in Supp. of Mot. for Summ. J. ["Pl.'s Br."]) ["Kilipko Dep."] 70:12–17, ECF No. 41-6.

[4] Dep. Tr. of Christopher Kear (attached as Ex. A to Pl.'s Br.) ["Kear Dep."] 14:20–23, 15:17–19, ECF No. 41-4.

[5] *Id.* 23:22–26:16.

[6] *Id.* 15:20–21, 30:10–14; Kilipko Dep. 17:16–18.

[7] Kilipko Dep. 25:13–27:4, 29:24–30:13.

[8] *Id.* 39:11–41:1.

practical nurse ("LPN") and/or a home health aide ("HHA") to the patient.[9]  Based on medical assessments by patients' physicians and the information provided by patients' parents,[10] Kilipko created "care plans" specifying proposed treatment.[11] Once a patient's doctor signed off on the care plan,[12] Kilipko oversaw its implementation.[13]  LPNs and HHAs kept notes recording the care provided.[14] To ensure compliance with the care plans, each week Kilipko reviewed notes that HHAs and LPNs submitted recording the care provided.[15]

HHAs were non-skilled workers who provided patients in-home assistance with daily living, such as preparing meals and performing other household chores.[16]  LPNs were skilled nurses who provided medical services, including administration of medication, feeding, and daily supervision of patients.[17]  In assigning an LPN to a given patient, Amazing Care considered the LPN's location, availability, and skillset.[18]

If a patient took issue with the care an HHA was providing, Amazing Care—not the HHA—discussed the problem with the patient.[19]  In contrast, LPNs addressed a patient's complaints directly with the patient or the patient's family.[20]  If they could not resolve a

---

[9] *Id.* 41:2–9, 50:24–51:21.

[10] *Id.* 39:11–41:9, 47:15–21.

[11] *Id.* 47:15–49:17.

[12] *Id.* 50:13–23.

[13] *Id.* 49:18–21.

[14] *Id.* 55:20–56:5.

[15] *Id.* 56:6–23.

[16] Kear Dep. 34:21–35:16.

[17] *Id.* 35:17–36:5.

[18] Kilipko Dep. 42:2–14.

[19] *Id.* 64:2–8.

[20] *Id.* 64:9–15.

problem independently, they were then required to notify Amazing Care.[21]

There was no limit to the amount of time off LPNs could take.[22]  They frequently took prolonged periods of time—such as up to a month—off.[23]  When LPNs took time off, they were required to inform Amazing Care, but they did not need Amazing Care's approval.[24]  Notably, LPNs were permitted to hire other LPNs with the required certifications and training as temporary replacement to cover patients' treatment in their absence.[25]

If a patient or family member notified Amazing Care that they were frustrated with an LPN's frequent calling out, Amazing Care included the complaint in the LPN's performance review.[26]  LPNs were not otherwise subject to adverse consequences or discipline for taking time off, even if Amazing Care had to close a case due to their absence.[27]

HHAs and LPNs had to satisfy training and certification requirements.[28]  They were required to attend in-house practical training and submit to testing.[29]  Additional specialized training was provided LPNs to suit particular patient needs,[30] and was sometimes given by a third-party instructor at Amazing Care's facility.[31]

---

[21] *Id.*

[22] *Id.* 72:10–73:15.

[23] *Id.* 72:10–13.

[24] *Id.* 73:10–22.

[25] *Id.* 61:5–63:14.

[26] *Id.* 75:2–76:15.

[27] *Id.* 72:9–73:15.

[28] *Id.* 43:20–44:11

[29] *Id.* 44:12– 47:3.

[30] *Id.* 44:8–11, 47:4–14.

[31] *Id.* 45:11–16.

During the period in question, most LPNs worked between eight and sixteen hours a day.[32]  Some worked up to twenty-four hours a day.[33]  Roughly 90 percent worked exclusively through Amazing Care, and did not contract with other healthcare agencies.[34]  Amazing Care aimed to staff HHAs and LPNs in patients' homes long-term to maintain consistency for the patient and the patient's family.[35]  It was common for an LPN to be assigned to a patient for several years to ensure continuity of care.[36]

Amazing Care equipped its HHAs with personal protective equipment such as barrier safety goggles, CPR shield face barriers, fluid resistant gowns, gloves, biohazard bags, sharps containers, and N95 respirators.[37]  It did not provide LPNs the PPE equipment it provided HHAs.[38]

During the relevant period, HHAs and LPNs were paid an hourly rate.[39]  Kear determined base salaries for all employees.[40]  HHAs were paid $9.00 to $12.50 per hour.[41]  LPNs' rate, which was higher than HHAs', varied based on experience and patients' treatment needs.[42]  LPNs and HHAs filled out the same weekly time sheets

---

[32] *Id.* 70:25–71:9.

[33] *Id.*

[34] *Id.* 43:14–19.

[35] Kear Dep. 36:19–37:19.

[36] Kilipko Dep. 71:10–18.

[37] *Id.* 68:7–70:9.

[38] *Id.* 68:10–13.

[39] Kear Dep. 61:3–7.

[40] Kilipko Dep. 34:4–6.

[41] Kear Dep. 61:3–5.

[42] *Id.* 61:3–15. Kear testified that he does not know what LPNs' wages range from, and that there is "no set rate," but agreed that their wages are generally more than HHAs' wages.  *See id.*

which were sent to a third-party vendor to generate payroll.[43]  They were subject to the same type of performance reviews at the same intervals.[44]

In 2016, as Amazing Care was preparing to begin operations, the American Commission of Health Care (ACHC) reviewed Amazing Care's intended practices, policies, bylaws, and clinical records to ensure that they were compliant with federal law.[45] ACHC granted Amazing Care accreditation in 2016 and has audited it every three years since.[46]  After completing its 2019 audit, ACHC recommended that Amazing Care classify some of its workers as W-2 employees and others as 1099 independent contractors.[47] According to Kear, ACHC recommended that Amazing Care "consider doing one of [its] service line[s] to be independent contractor[s], and home aides, W-2."[48]

ACHC did not recommend Amazing Care pay any workers overtime or explain that workers classified as "independent contractors" need not be paid overtime.[49]  ACHC had not reviewed Amazing Care's pay practices or workers' time sheets as part of its audit.[50] According to Kear, ACHC merely recommended the reclassification on the basis that "that's how a lot of agencies go about business now."[51]  Kear testified that ACHC did not specify which workers should be W-2 and which should be 1099.  Rather, he "came up

---

[43] *Id.* 54:5–55:16.

[44] *Id.* 52:19–21.

[45] *Id.* 71:20–73:10, 74:7–75:5.

[46] *Id.* 74:7–22.

[47] *Id.* 62:18–21.

[48] *Id.* 63:1–8, 75:14–21.

[49] *Id.* 63:3–8.

[50] *Id.* 75:6–76:9.

[51] *Id.* 75:17–76:9.

with the distinction" between LPNs as independent contractors and HHAs/office staff as W-2 employees, and Kilipko helped him make that decision.[52]

The record is unclear about how Amazing Care's workers were originally classified and later reclassified. Kilipko testified that all HHAs and LPNs were initially classified as 1099 independent contractors.[53] Kear confirmed her testimony.[54] But, contradicting himself, he testified that prior to May 2019, all HHAs and LPNs were classified as employees,[55] and for its "first one or two years" of operation, Amazing Care paid all its workers via W-2.[56]

Kear testified that, in response to the ACHC auditor's recommendation that Amazing Care maintain two categories of workers, Amazing Care classified all LPNs as independent contractors and all HHAs and other staff as W-2 employees,[57] and started paying overtime wages to its W-2 employees.[58] Kilipko testified that the reclassification was directed rather than recommended, stating that ACHC told Amazing Care its workers "cannot be all 1099," and that "one line of [its] service has to be W-2 and one line has to be 1099[.]"[59] According to Kilipko, Amazing Care responded by switching HHAs from

---

[52] *See id.* 63:1–8, 64:14–66:1.

[53] Kilipko Dep. 89:12–21.

[54] Kear Dep. 63:9–11. Kear testified. "[F]rom the beginning, we were doing . . . both home health aides and LPNs to be independent contractors," *id.* at 62:16–18, and "when we started our operation, we would not pay anybody overtime because everybody was going with the independent contractor basis," *id.* at 63:16–21.

[55] *See id.* 81:14–16.

[56] *Id.* 63:9–11.

[57] *Id.* 64:6–65:7.

[58] *Id.* 64:2–13. Kear testified that Amazing Care has continued to pay its W-2 workers overtime since it began doing so after the ACHC audit. *See id.*

[59] Kilipko Dep. 84:15–85:2.

1099 status to W-2 status while keeping LPNs at 1099 status.[60]  Kilipko also stated that HHAs who worked more than 30 hours of overtime per week or who simply "preferred" being paid via 1099 also remained classified as 1099 employees.[61]

In a March 1, 2019 memo to "all part-time and fulltime employees,"[62] Kear announced that, effective May 1, 2019, the recipients would "no longer have an option for W2 or W4 tax withholding" and must "sign up for the Independent Contractor services," which meant they would "have to pay [their] own taxes and register [their] name or business . . . to receive an employer identification number (EIN)."[63]  This suggests that, prior to May 1, 2019, workers were treated as W-2 employees.

According to the DOL, Amazing Care classified all HHAs and LPNs as W-2 employees prior to May 1, 2019 before changing some of those employees to independent contractor status.[64]  In its briefing, the DOL states that "[i]f anyone at Amazing Care after 2019 wanted to work more than thirty overtime hours a week, Amazing Care insisted they be paid as independent contractors and given 1099 tax forms instead of W-2 tax forms[.]"[65]  The defendants do not meaningfully dispute the DOL's account of how workers were classified historically or how they were reclassified following the ACHC audit.  But, the inconsistencies in Kear and Kilipko's testimony confuse the

---

[60] *Id.* 89:12–90:15.  In contrast to Kilipko's testimony that the ACHC auditor told Amazing Care that "one line of [its] service *has to* be W-2 and one line *has to* be 1099," *see id.* 84:21–23 (emphasis added), Kear testified that ACHC merely "recommended" the change, *see* Kear Dep. 63:1–8, 65:12–13.

[61] Kilipko Dep. 90:4–21.

[62] *See* Mar. 1, 2019 Memo (attached as Ex. F to Pl.'s Br.), ECF No. 41-1.

[63] *See id.* (emphasis removed). *See also* Kear Dep. 79:5–7 (explaining that the memo was sent to "all [Amazing Care] employees").

[64] *See* Pl.'s SUMF ¶¶ 64–76.

[65] *See id.* ¶ 76.

8

history.

None of the LPNs' or HHAs' job protocol or responsibilities changed on May 1, 2019—the date when workers were reclassified.[66] When Amazing Care reclassified the workers, Kear knew that some LPNs and HHAs were working more than 40 hours a week,[67] and that workers classified as independent contractors were not entitled to overtime.[68]

Around July 2021, investigator Nata Mamulashvili from the DOL's Wage and Hour Department began an investigation into Amazing Care to determine whether its practices were FLSA-compliant.[69] The defendants provided her payroll reports showing the workers' status as W-2 employees or 1099 independent contractors, the hours worked in each pay period, the rate of pay, and the total amount paid to a given worker during the pay period.[70] The records did not record the amount of overtime hours worked, overtime rate, amount of overtime pay owed, daily or weekly straight-time earnings, or wages earned for HHAs and LPNs from July 13, 2020 through December 27, 2024.[71] Nor did they identify which employees were HHAs and which were LPNs.[72]

The DOL investigation also revealed that from July 13, 2020 through December 27, 2024, Amazing Care did not pay 284 individuals who worked as HHAs or LPNs

---

[66] Kear Dep. 80:20–81:9.

[67] *Id.* 81:17–23.

[68] *Id.* 21:11–19.

[69] Dep. Tr. of Nata Mamulashvili (attached as Ex. F to Mem. of L. in Opp'n to Pl.'s Br. for Summ. J. ["Defs.' Opp'n"]) ["Mamulashvili Dep."] 25:13–27:11, ECF No. 45-1.

[70] *Id.* 32:15–23; Decl. of Nata Mamulashvili ["Mamulashvili Decl."] ¶¶ 4–6, ECF No. 41-5; Pl.'s SUMF ¶ 53.

[71] Pl.'s SUMF ¶ 55; Mamulashvili Decl. ¶¶ 6–7. *See also* Payroll Summary (attached as Ex. D to Pl.'s Br.), ECF No. 4-17.

[72] *See* Payroll Summary.

9

overtime premium for hours worked in excess of 40 hours in a workweek.[73]  Mamulashvili calculated the total amount of unpaid overtime owed to HHAs and LPNs during that period as $5,919,096.34.[74]

As for workers' reclassification, the DOL's investigation report states that, according to Kear, all HHAs were paid via W-2 before "many" were switched to 1099 status on May 1, 2019, but that all HHAs were subsequently switched back to "employee" status on January 1, 2022 following an initial conference with the DOL's Wage and Hour Division.[75]  According to the report, Amazing Care began paying all HHAs overtime following that change.[76]

Kear testified that, at the time of his January 2025 deposition, all HHAs were classified as W-2 employees.[77]  LPNs who worked 40 hours or less per week were paid as 1099 employees, either under their own name or their LLCs.[78]  LPNs who worked overtime were paid through their own LLCs as 1099 entities.[79]  Before the May 1, 2019 reclassification, LPNs were not paid overtime wages.[80]  Kear testified that after the DOL investigation began, Amazing Care started paying its HHAs and LPNs overtime pay.[81]

---

[73] Pl.'s SUMF ¶ 57; Mamulashvili Decl. ¶ 7. *See also* Notice of Filing Revised Schedule A and attached Revised Schedule A (listing workers "identified during litigation as due back wages and liquidated damages"), ECF Nos. 40, 40-1.

[74] Mamulashvili Decl. ¶ 8.

[75] *See* DOL Investigation Report (attached as Ex. C to Defs.' Opp'n) at DOL-AC-000019, ECF No. 45-1.

[76] *See id.*

[77] Kear Dep. 69:11–16.

[78] *Id.* 69:22–70:10, 71:16–19.

[79] *Id.* 70:11–14.

[80] *Id.* 63:12–21, 70:15–19.

[81] *See id.* 69:14–21, 70:16–19.  Kear also testified that Amazing Care has been paying workers classified as W-2 employees overtime ever since the ACHC audit, in 2019 or 2020—that is, prior to the DOL investigation. *See id.* 64:2–13.

But, according to Amazing Care's pay records, 284 individuals who worked as HHAs or LPNs were not paid overtime wages from July 13, 2020 through December 27, 2024.[82] In their opposition to the DOL's motion, the defendants do not dispute the DOL's assertion that they did not pay those individuals overtime wages during that period.

Following its investigation, the DOL brought this action alleging violations of the overtime and recordkeeping provisions of the FLSA.[83]  It alleges that the defendants willfully violated Sections 7 and 15(a)(2) by failing to pay some HHAs and LPNs overtime rates, and violated Sections 11(c) and 15(a)(5) by failing to make, keep, and preserve adequate and accurate employee records.[84]

The defendants do not dispute that Amazing Care is a covered entity under the FLSA Section 3(s)(1), Kear is an "employer" under Section 3(d) jointly liable for the alleged violations, and that they erred in classifying HHAs as independent contractors.[85] Kilipko disputes that she is an employer.[86]  The defendants insist that LPNs are independent contractors, not employees.[87]  They disagree that the DOL is entitled to liquidated damages under Section 16(c) and that they violated Section 11(c) recordkeeping provisions.[88]  A significant issue is whether the undisputed evidence

---

[82] *See* Mamulashvili Decl. ¶¶ 6–7; Payroll Summary.

[83] *See* Compl. ¶¶ 10–17, ECF No. 1.

[84] *See id.*

[85] The defendants do not present any facts or argument in response to the DOL's position that Amazing Care is a covered entity, Kear is an employer, HHAs were wrongfully denied overtime pay, or the defendants failed to keep FLSA-compliant employee records.  They explicitly concede that HHAs are not independent contractors.  *See* Defs.' Counterstatement of Facts ["Defs.' COF"] 5 n.3, ECF No. 45 ("Defendants are not disputing having erred in classification as to HHAs.").

[86] *See* Mem. of L. in Opp'n to Pl.'s Br. for Summ. J. ["Defs.' Opp'n"] 20–23, ECF No. 45.

[87] *See id.* at 15–20.

[88] *Id.* at 19–20, 24.

shows the defendants' conduct was willful, extending the statute of limitations to three years rather than two.[89]    Finally, the defendants challenge the accuracy of the DOL's backpay calculations.[90]

## Analysis[91]

### Kilipko's Employer Status

The FLSA expansively defines "employer" as "any person acting directly in the interest of an employer in relation to an employee[.]"  29 U.S.C. § 203(d); *In re Enterprise Rent-A-Car Wage & Hour Emp. Practices Litig.*, 683 F.3d 462, 467–68 (3d Cir. 2012). Several persons or entities can be deemed joint employers responsible for paying overtime compensation under the FLSA.  *Thompson v. Real Est. Mortg. Network*, 748 F.3d 142, 148 (3d Cir. 2014) (citing 29 C.F.R. § 791.2).  Individuals are joint employers when they "'exert significant control' over the employee, 'by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.'" *Id.* at 148 (citations omitted).

To determine whether a "joint employer" relationship exists, we must consider "the total employment situation and the economic realities of the work relationship." *Enterprise*, 683 F.3d at 469.  Factors include: (1) authority to hire and fire the relevant employees; (2) authority to promulgate work rules and assignments and to set the

---

[89] *See* Pl.'s Br. 14–15; Defs.' Opp'n 26–27.

[90] *See* Defs.' Opp'n 15; Defs.' COF ¶¶ 20–24.

[91] In examining the DOL's motion for summary judgment, we view the facts in the light most favorable to the defendants and draw all reasonable inferences in their favor.  *Peroza-Benitez v. Smith,* 994 F.3d 157, 164 (3d Cir. 2021) (citing *Santini v. Fuentes*, 795 F.3d 410, 419 (3d Cir. 2015)).  We are mindful that disagreements over what inferences may be drawn from the facts, even undisputed ones, preclude summary judgment.  *Revock v. Cowpet Bay W. Condo. Ass'n,* 853 F.3d 96, 112 (3d Cir. 2017) (citing *Windsor Sec., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 659 (3d Cir. 1993)).

employees' conditions of employment: compensation, benefits, and work schedules, including the rate and method of payment; (3) involvement in day-to-day employee supervision, including employee discipline; and (4) actual control of employee records, such as payroll, insurance, or taxes.  *Id.*

The DOL contends that Kilipko is an employer under Section 3(d) of the FLSA because she oversaw hiring and retention of HHAs and LPNs, oversaw nursing care, created care plans, and reviewed treatment records and time sheets.[92]  It argues, without analysis, that "all four non-exhaustive prongs" of the *Enterprise* test weigh in favor of finding Kilipko a joint employer.[93]  Kilipko counters that because she had no authority over wages, she cannot be liable as an employer for the alleged recordkeeping and payment violations.

In *Secretary United States Department of Labor v. Mosluoglu, Inc.*, the Secretary of Labor sued a diner's owner and its manager for violations of FLSA minimum wage, overtime, and recordkeeping requirements.  No. 22-2749, 2023 WL 5972044, at *1 (3d Cir. Sept. 14, 2023).  The Third Circuit, applying the *Enterprise* factors, held that the diner's manager was an "employer" subject to liability because, even though the owner "retained ultimate authority over the operation of the business," the manager "had significant control" over employees.  *Id.* at *3.  The first factor, authority to hire and fire the workers at issue, weighed in favor of joint employer status because the manager could unilaterally hire servers.  *Id.* at *2.  The second factor, authority to promulgate work rules and assignments and set conditions of employment, supported joint employer status

---

[92] *See* Pl.'s Br. at 8.

[93] *See id.*

because the manager worked with the diner's owner to set work schedules, assign employees to workstations, and make policy decisions. *Id.* The third factor, involvement in day-to-day employee supervision, including employee discipline, supported employer status because the manager was responsible for disciplining employees and workers needed his permission to adjust their work schedules. *Id.* The fourth factor, actual control of employee records, suggested the manager was an employer because he recorded employees' time and sent time sheets to payroll, deposited pooled tips, and distributed paychecks. *Id.* at *3. These facts resemble those in this case.

Here, with respect to the first *Enterprise* factor, Kilipko was involved in the hiring process for HHAs and LPNs, which included conducting background checks and verifying requisite qualifications.[94] She also testified that she was "part of the meeting" when workers were fired.[95] Kear testified that Kilipko could hire and fire workers on her own, but that he could override her decision if he disagreed.[96] Although it is unclear whether Kilipko could hire and fire workers without Kear's approval, it is clear that she played a role in making these decisions. We find that the first *Enterprise* factor favors joint employer status.

As to the second factor, the evidence shows that Kilipko participated in activities and decisions affecting work rules, assignments, work conditions, schedules, and, indirectly, compensation. Kilipko created the care plans that dictated the treatment that HHAs and LPNs had to administer to patients,[97] and determined which care providers

---

[94] Kilipko Dep. 25:16–27:4.

[95] *Id.* 30:11–31:10.

[96] *See* Kear Dep. 24:2–24.

[97] Kilipko Dep. 48:9–49:21, 55:20–56:11, 57:24–58:4.

were offered assignments.[98]  In her words, she "overs[aw] the nursing aspect of Amazing Care."[99]

Kear determined workers' wage rates.[100]  Kilipko did not.[101]  But, Kilipko played a role in determining which workers were classified as employees or independent contractors.  Kear testified that although the reclassification decision was ultimately his, Kilipko—who knew that the classification affected whether workers would be paid overtime—helped him make it.[102]  That is significant because workers' reclassification determined their entitlement to overtime—the employment decision at issue.

That Kilipko did not have ultimate control over workers' wages is not dispositive.  The Third Circuit has made clear that both direct and indirect control may show joint employer status.  *See Enterprise*, 683 F.3d at 469 (explaining that joint employment exists not only where an employer has direct control over an employee, but also where the employer has "sufficient *indirect* control as well").  The extent of Kilipko's control over workers satisfies the second *Enterprise* factor.

Regarding the third factor, Kilipko supervised HHAs and LPNs and was involved in their discipline.  She reviewed their notes on a weekly basis to ensure compliance with care plans and proper documentation of treatment.[103]  If a worker was not following the care plan or failed to document how they were following it, Kilipko took corrective

---

[98] *See id.* 42:2–14.

[99] *Id.* 25:13–15.

[100] *Id.* 33:17–35:16; Kear Dep. 24:25–25:3.

[101] *Id.*

[102] *See* Kear Dep. 65:3–66:1; Kilipko Dep. 83:3–84:3, 85:21–24.

[103] Kilipko Dep. 56:6–58:8.

action.[104]  She conducted HHAs' and LPNs' performance reviews.[105]  Her authority over

their day-to-day work and the evaluation process satisfies the third *Enterprise* factor.

As to the fourth factor, Kilipko had actual control over workers' records.  She

reviewed workers' time sheets and completed their performance reviews.[106] *See Talarico*

*v. Pub. P'ships, LLC*, 837 F. App'x 81, 85 (3d Cir. 2020) (finding fourth *Enterprise* factor

weighed in favor of joint employer status where the defendant had control over

"employment records, tax forms, employment enrollment packet, and time sheets").

Because the *Enterprise* factors weigh in favor of employer status, we conclude that

Kilipko was a joint employer responsible for paying overtime compensation and complying

with the recordkeeping requirements of the FLSA.

## Employee Status of LPNs

It is the DOL's burden to prove workers are "employees" under the FLSA. *Razak*

*v. Uber Techs.*, 951 F.3d 137, 143 (3d Cir. 2020).  The FLSA defines an employee as

"any individual employed by an employer."  29 U.S.C. § 203(e)(1).  To determine

employee status, the Third Circuit applies the test established by the Ninth Circuit

in *Donovan v. Sureway Cleaners*, 656 F.2d 1368 (9th Cir. 1981). *See Donovan v.*

*DialAmerica Mktg., Inc.*, 757 F.2d 1376, 1383 (3d Cir. 1985) (adopting the *Sureway*

*Cleaners* test).

The *Sureway Cleaners* test analyzes six factors to determine whether a worker is

an employee under the FLSA: (1) the degree of the alleged employer's right to control the

manner in which the work is to be performed; (2) the alleged employee's opportunity for

---

[104] *See id.* 57:9–58:8.

[105] *Id.* 74:18–75:8.

[106] *See id.* 74:18–75:25.

profit or loss depending upon his or her managerial skill; (3) the alleged employee's investment in equipment or materials required for his or her task, or his or her employment of helpers; (4) whether the service rendered requires a special skill; (5) the degree of permanence of the working relationship; and (6) whether the service rendered is an integral part of the alleged employer's business. *Razak*, 951 F.3d at 142–43 (quoting *DialAmerica*, 757 F.2d at 1382 (quoting *Sureway Cleaners*, 656 F.2d at 1370)).  No one factor is determinative. *Id.* at 143. "[C]ourts should examine the circumstances of the whole activity" to determine whether "as a matter of economic reality, the individuals are dependent upon the business to which they render service."  *Id.* (internal citations and quotation marks omitted).

Whether workers are employees or independent contractors is a question of law. *Id.* at 145.  However, if there is a genuine dispute of material fact bearing on whether a *Sureway Cleaners* factor weighs in favor of employee status, it is for the factfinder to resolve.  *See id.*

The DOL contends that the *Sureway Cleaners* factors demonstrate HHAs and LPNs are employees.[107]  The defendants do not deny that HHAs are employees.[108]  They dispute that LPNs are, insisting they are independent contractors.[109]

We now examine the *Sureway Cleaners* factors.  Our analysis is guided by the Second Circuit's decision in *Brock v. Superior Care, Inc.*, a remarkably similar FLSA case involving the status of nurses working for a healthcare company providing services at patients' homes. 840 F.2d 1054 (2d Cir. 1988).  In that case, the Second Circuit Court of

---

[107] *See* Pl.'s Br. 8–12.

[108] *See* Defs.' COF 5 n.3.

[109] *See* Defs.' Opp'n 15–19.

Appeals applied a test nearly identical to the *Sureway Cleaners* test to review the district court's finding that the nurses the employer had classified as independent contractors were employees as a matter of law. *See Brock*, 840 F.2d at 1057. The defendant, Superior Care, hired nurses and placed them on a roster, assigning them work opportunities as they became available. *Id.* at 1058–59. Nurses were free to decline a proposed referral "for any reason," and reported directly to the patient once they accepted an assignment. *Id.* They were required to submit patient care notes to Superior Care for review pursuant to state and federal law, and Superior Care conducted job site visits once or twice a month. *Id.* An assignment could last up to several months, depending on the patient's condition. *Id.* Patients contracted directly with Superior Care—not the nurses themselves—and nurses were paid an hourly wage set by Superior Care. *Id.* Nurses could negotiate higher pay rates for assignments involving special patient treatment or an inconvenient location. *Id.* They were permitted to hold other jobs, including with other nursing care providers. *Id.*

Superior Care maintained two payrolls for its nursing staff—one for nurses it classified as employees and the other for nurses it classified as independent contractors. *Id.* Nurses on the "employee" payroll had their payroll taxes deducted and were not permitted to work overtime. *Id.* Nurses on the "independent contractor" payroll were not taxed and were permitted to work overtime. *Id.* They were not paid time and a half for overtime hours because they were classified as independent contractors. *Id.* Classification was usually determined by Superior Care, but sometimes at a nurse's request. *Id.* at 1057–58. The parties stipulated that the two sets of nurses performed "exactly the same work." *Id.* at 1058.

The first *Sureway Cleaners* factor, the alleged employer's right to control the manner in which work is to be performed, is "highly relevant to the FLSA analysis." *Razak*, 951 F.3d at 145. It is the right to control—not actual control—that is required. *Id.* (citing *DialAmerica*, 757 F.2d at 1382).

In *Brock*, the "control" factor weighed in favor of employee status despite the nurses' ability to turn down assignments and work for other employers, in part because the employer unilaterally dictated nurses' hourly wages and supervised them by monitoring patient care notes and visiting job sites. *See Brock*, 840 F.2d at 1057, 1060. That the site visits were infrequent—only once or twice a month—carried little weight because the defendant "unequivocally expressed the right to supervise the nurses' work, and the nurses were well aware that they were subject to such checks" and "regular review of their nursing notes." *Id.* at 1060. *See also Jimenez v. Best Behav. Healthcare, Inc.*, 391 F. Supp. 3d 380, 388 (E.D. Pa. 2019) (finding control factor weighed in favor of finding plaintiff psychotherapist was an employee because the defendant "intervened" in the plaintiff's work "administratively and clinically" by controlling "both the manner in which [the plaintiff] maintained notes for billing purposes and the way that [he] actually conducted himself while providing therapy").

Here, the DOL argues the defendants exercised control over LPNs' work because they unilaterally set LPNs' hourly wages, reclassified them as independent contractors, dictated how patients were to be cared for under the care plans,[110] reviewed weekly documentation to confirm LPNs were complying with the care plans, required them to

---

[110] *See* Pl.'s Br. 9; Sec'y of Lab.'s Reply in Supp. of Mot. for Summ. J. ["Pl.'s Reply"] 3, ECF No. 49.

report lateness or absence, and evaluated their performance.[111]  The DOL argues these facts demonstrate the defendants not only had the right to control but actually controlled the manner in which LPNs worked.[112]  The defendants counter that LPNs' control over their work is evidenced by their ability to adjust their own schedules, turn down assignments, take as much time off as they wanted, communicate directly with patients about lateness, and hire temporary replacement LPNs to administer patient care in their absence.[113]

As in *Brock*, that LPNs were permitted to turn down assignments and work for other employers does not outweigh Amazing Care's control over their work.  The ability to have other jobs does not alter that control.  "Employees may work for more than one employer without losing their benefits under the FLSA."  *Brock*, 840 F.2d at 1060 (finding nurses were employees even where they typically worked for several employers, and did not rely on the defendant as their primary source of income).

Even if working for another employer were significant, it was not the reality for most LPNs.  Amazing Care was the sole source of income for over 90 percent of its nursing staff.[114]  Further, it arguably exercised as much, if not more, control over its nurses as the defendants did in *Brock*.  Kilipko created detailed care plans that dictated how LPNs were to treat their patients, and she reviewed workers' care notes to ensure those plans were followed.  When LPNs' treatment deviated from the care plans, Kilipko instructed them that they had to care for patients the way she prescribed.

---

[111] *See* Pl.'s Br. 9; Pl.'s Reply 3.

[112] *See* Pl.'s Br. 9; Pl.'s Reply 5.

[113] *See* Defs.' Opp'n 15–18.

[114] Kilipko Dep. 43:14–19.

LPNs' ability to communicate directly with patients about lateness is insignificant. They were still required to inform Amazing Care. Further, while LPNs could contact their patients directly, they could not contract with them. Patients contracted with Amazing Care. LPNs had no contractual relationship with patients or their insurance carriers. *See Brock*, 840 F.2d at 1057 (noting that patients "contract[ed] directly with [the defendant employer], not with the nurses, and the nurses [were] prohibited from entering into private pay arrangements with the patients").

LPNs' ability to hire a temporary replacement LPN also carries little weight. While the ability to do so may "point to a lack of control by [Amazing Care]," *see Razak*, 951 F.3d at 143, it is not dispositive. The analysis turns on the "economic reality" of LPNs' work, not merely on what LPNs were technically permitted to do. The reality is that LPNs hardly ever hired their own replacement. According to Kilipko, it happened less than ten times in the preceding five years.[115]

Amazing Care exercised ultimate control over substitute LPNs' temporary engagement. It had to verify substitutes had the mandatory training and certifications, and keep that information in its files.[116] If a patient or third party wanted to verify a substitute's credentials, Amazing Care—not the LPN—provided them. If Amazing Care failed to maintain the requisite documentation for a substitute, it risked citation by state authorities.[117] Its stake in the choice of substitute LPN reveals its involvement in the selection process.

Overall, LPNs' technical ability to find a temporary replacement does not weigh

---

[115] *Id.* 63:15–25.

[116] *Id.* 62:11–63:14.

[117] *Id.* 63:9–14.

heavily in favor of independent contractor status because it was rarely employed and was not an independent process between the LPN and the temporary substitute.

LPN's authority to turn down shifts, work for other employers, communicate directly with patients, and hire temporary replacements does not diminish Amazing Care's control over the clinical and administrative aspects of their work.  *See Verma v. 3001 Castor, Inc.*, No. 13-3034, 2014 WL 2957453, at *7 (E.D. Pa. June 20, 2014) (finding the control factor "weigh[ed] overwhelmingly in favor" of finding workers were employees where "the [workers'] control over their schedules [was] minimal compared to all of the elements of the work that [the] [d]efendant controlled"), *aff'd,* 937 F.3d 221 (3d Cir. 2019).  This factor weighs in favor of employee status.

The second *Sureway Cleaners* factor, opportunity for profit or loss depending on the worker's managerial skill, weighs in favor of employee status.  LPNs had no chance of gaining a profit or suffering a loss based on their own initiative or performance.

The DOL asserts that LPNs did not have meaningful opportunity for profit or loss because Kear set their hourly wages and hours were "dictated by the patients' care needs" as defined by the care plans Kilipko created.[118]  The defendants do not explicitly rebut this argument.

LPNs have the technical ability to choose which assignments to accept, whether to take jobs with other employers, and when to obtain temporary replacements.  Amazing

---

[118] *See* Pl.'s Br. 10.  The DOL states that LPNs' pay was "subject to review and approval by Defendant Josephine Kilipko."  *See id.* (citing Pl.'s SUMF ¶ 31 (citing Kilipko Dep. 55:20–57:23)).  The testimony the DOL cites establishes that Kilipko reviewed LPNs' weekly care notes to ensure LPNs were following the care plans and correctly documenting their steps in doing so.  It does not, however, establish that LPNs' pay was subject to Kilipko's "review and approval" of the care notes.  The record shows that Kear—not Kilipko—determined workers' pay.  When asked who "set[s] pay rates for home health aides and nurses," Kear responded, "I make the final decision."  Kear Dep. 24:25–25:8. *See also* Kilipko Dep. 33:17–35:16 (explaining that only Kear determines workers' pay rates).

Care aimed to staff LPNs on long-term assignments requiring up to eighteen hours of work a day, which limited how much LPNs could realistically work for Amazing Care and another employer at the same time.  Roughly 90 percent of LPNs were employed solely by Amazing Care.[119]  Their ability to shape their schedules by turning down assignments did not, as a matter of economic reality, create meaningful opportunity for profit or loss. *See Brock*, 840 F.2d at 1059 (affirming the district court's finding that, despite being free to decline referrals and take jobs elsewhere, the defendant's nursing staff had no opportunity for profit or loss).  Nor does their ability to find temporary replacements, for the reasons discussed above.

LPNs' ability to negotiate higher hourly rates for more demanding assignments carries little weight.[120]  Although they could request an increased rate for more complex cases, the unilateral authority to set their pay rate was Kear's alone.[121]  *See id.* at 1057 (affirming district court's finding that workers were employees despite their ability to negotiate pay rates for certain assignments).  Thus, LPNs' ability to turn down assignments, find temporary replacement LPNs, and negotiate their own wages did not amount to a real opportunity for profit or loss.

Even if those abilities did significantly affect LPNs' opportunity for profit or loss, any "managerial skill" LPNs exercised was far outweighed by the defendants' management of Amazing Care's operations, including accepting patients, setting wages, and managing case assignments.  This factor weighs in favor of employee status.

The third *Sureway Cleaners* factor, the alleged employee's investment in required

---

[119] Kilipko Dep. 43:4–19.

[120] *Id.* 34:14–35:16.

[121] *Id.* 33:17–35:16; Kear Dep. 24:25–25:8.

equipment or materials, or employment of helpers, weighs against employee status, albeit slightly. The record shows—and the DOL does not dispute—that LPNs were required to supply their own PPE equipment, including safety goggles, fluid resistant gowns, gloves, and N95 respirators, while Amazing Care provided HHAs the same equipment for free.[122] But, the record does not show that LPNs had to purchase equipment beyond their own protective gear, such as the medical tools and materials needed to treat their patients.

As for the fourth factor, the use of special skills is not an indication of independent contractor status unless the skills are used in an "independent way." *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1295 (3d Cir. 1991). In *Martin*, gas station operators were found to be employees of the defendant, a gasoline distributor, in part because the distributor exercised "pervasive control over the day-to-day operations" of the gas stations. *Id.* at 1294. It set prices, required the operators to make daily sales reports, visited the stations to oversee operations, controlled the stations' appearance and operating hours, and participated in the hiring and payment decisions of the stations' mechanics. *Id.* at 1294. The defendant's degree of control over daily operations meant the stations did not operate independently enough to suggest they were independent contractors. *Id.* at 1289–90. Therefore, even if the parties agreed pumping gas was a special skill, that skill "[could not] be said to support a conclusion of independent contractor status." *See id.* at 1289–90.

In *Brock*, the skill factor did "not weigh significantly in favor of independent contractor status" because "[t]he nurses . . . possess[ed] technical skills but nothing in the record reveal[ed] that they used these skills in any independent way." 840 F.2d at 1060.

---

[122] Kilipko Dep. 68:7–70:9.

That was the situation here.

The DOL concedes that LPNs "may possess technical skills that require significant specialized training."[123]  But, it argues because their treatment of patients is so limited by Kilipko's care plans, LPNs "are not permitted to exercise their independent judgment or discretion" in applying their specialized skills and thus do not use their specialized skills in an independent way.[124]  So, they contend, the skill factor "do[es] not weigh in favor of independent contractor status."[125]

Kilipko created the care plans that dictated how LPNs treated their patients.[126]  LPNs were required to document their adherence to the care plans and send them to Kilipko for review.[127]  Kilipko spent up to 40 hours a week reviewing LPNs' and HHAs' notes to ensure adherence to her care plans.[128]  If an LPN's notes reflected deviation from the plan, they were instructed to follow it.[129]  Kilipko's "number one thing" she did with regard to LPNs was to make sure they were following the care plan.[130]  Her daily oversight over how the LPNs used their skills shows that they did not exercise independent judgment in using them.  As in *Martin*, the LPNs' lack of authority of how they employ their specialized skills means this factor does not support a finding of independent contractor status.

---

[123] *See* Pl.'s Br. 10.

[124] *See id.* at 10–11.

[125] *See id.* (citing *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1060 (2d Cir. 1988); *Jimenez v. Best Behavioral Healthcare, Inc.*, 391 F. Supp. 3d 380, 390 (E.D. Pa. 2019)).

[126] Kilipko Dep. 48:9–19.

[127] *Id.* 55:20–56:13.

[128] *Id.* 56:6–57:8.

[129] *Id.* 57: 9–58:8.

[130] *Id.* 57:24–58:4.

The fifth *Sureway Cleaners* factor is the permanence of the working relationship. In *Donovan v. DialAmerica Marketing, Inc.*, this factor supported a finding that the plaintiffs were employees under the FLSA because the record showed the relationship with the employer was "not transitory." 757 F.2d 1376, 1384 (3d Cir. 1985). Although workers were permitted to work for other organizations while working for the defendant, only three among dozens actually did so. *Id.* Generally, workers "did not transfer their services from place to place, as do independent contractors." *Id.* (citing *Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1372 (9th Cir. 1981)). Rather, they "worked continuously for the defendant, and many did so for long periods of time." *Id.*

Here, although LPNs were permitted to work concurrently for other care providers, few did. About 90 percent worked exclusively with Amazing Care,[131] whose goal was to staff LPNs in patients' homes long-term—up to several years at a time—to maintain consistency of care.[132] Though they had permission to work for other companies, the overwhelming majority of LPNs did not have a "transitory" working relationship with Amazing Care. *See Donovan*, 757 F.2d at 1384. This factor does not weigh in favor of independent contractor status.

The last *Sureway Cleaners* factor—whether LPNs provided services integral to the defendants' business—weighs strongly in favor of employee status. Amazing Care's business is providing in-home healthcare to pediatric patients. LPNs provided that healthcare. In *Brock*, this factor "weig[ed] heavily" in favor of employee status because "the services rendered by the nurses constituted the most integral part of Superior Care's

---

[131] *Id.* 43:4–19.

[132] Kear Dep. 36:19–37:19.

business, which is to provide health care personnel on request." 840 F.2d at 1059–60.

Finally, additional facts in the record that do not fall neatly under any *Sureway Cleaners* factor suggest the "economic reality" is that LPNs are employees. *See Razak*, 951 F.3d at 143. The *Brock* court found it "significant" that, while nurses who did not work overtime were categorized as employees, others with the exact same job duties but who did work overtime were labeled independent contractors and, consequently, not paid overtime wages. *See Brock*, 840 F.2d at 1057. Though both groups had identical job descriptions, the employer conceded only the nurses in the first—those who were not permitted to work overtime—were employees covered by the FLSA. *See id.* at 1059.

"Though an employer's self-serving label of workers as independent contractors is not controlling, an employer's admission that his workers are employees covered by the FLSA is highly probative." *Id.* (internal citations omitted). As in *Brock*, numerous material similarities exist between the group of workers that Amazing Care concedes are employees (HHAs) and those it contends are independent contractors (LPNs). Both were required to sign the same job acceptance form, which varied only by job title, pay rate, starting date, and shift times.[133] Both were required to sign the same Employee Handbook upon hiring,[134] which was the sole source of Amazing Care's policies and procedures.[135] Amazing Care provided training for HHAs and LPNs.[136] The assignment

---

[133] *See* Job Offer Forms (attached as Exs. C and D to Pl.'s Reply), ECF Nos. 49-3, 49-4. In a 2018 LPN job acceptance form, the blank describing the LPN's position is filled in to read "full time employee," while a 2020 job acceptance form is filled out to read "independent contractor employee[.]" *See id.*

[134] Kear Dep. 45:7–25.

[135] *Id.* 52:25–53:3; Kilipko Dep. 77:1–8.

[136] Kilipko Dep. 43:20–44:11.

process was the same for both.[137]  Both were required to fill out the same time sheets, follow Kilipko's care plans, and submit care notes for review.[138]  They received performance reviews from Kilipko at the same intervals.[139]  Both were required to inform Amazing Care about absence and lateness.[140]  Notably, they were subject to the same procedure for leave, which allowed both to take off extended periods of time.[141]  For most HHAs and LPNs, Amazing Care was the sole employer.[142]

Following LPNs' reclassification to "independent contractors," Amazing Care continued to refer to them as "employees" in internal documents. [143]  For example, a 2020 LPN job acceptance form details Amazing Care's "employment process" that the LPN must complete, explains that the LPN's "employment, like everyone's employment [at Amazing Care], is considered 'employment at will,'" states that the LPN or Amazing Care "may end [the] employment at any time," and notes that Amazing Care is "delighted to extend th[e] offer of employment" to the LPN.[144]  Amazing Care's own job descriptions and labels for its workers are not dispositive of employee status.  *See Jimenez*, 391 F. Supp. 3d at 388 ("[P]utting on an 'independent contractor' label does not take the worker from the protection of the [FLSA]." (alteration in original) (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947))).  But, the job descriptions and labels show how

---

[137] Kilipko Dep. 71:23–72:2.

[138] *Id.* 55:20–57:15, 74:12–17.

[139] *Id.* 74:18–33.

[140] *Id.* 58:14–59:15.

[141] *Id.* 73:16–74:11.

[142] *Id.* 43:14–19.

[143] Kear testified that, in 2024, Amazing Care eventually changed its internal documents for LPNs to read "independent contractor" rather than "employee."  *See* Kear Dep. 39:14–43:10.  None of Amazing Care's documents in the record are that recent, and thus do not reflect that change.

[144] *See* Job Offer Form (attached as Ex. D to Pl.'s Reply), ECF No. 49-4.

Amazing Care regarded LPNs. The economic reality of the working relationship is Amazing Care viewed and treated LPNs as employees, not independent contractors.

In summary, LPNs were hired, trained, supervised, and fired like employees. Amazing Care exercised significant control over when, where, and how they worked. They had no meaningful opportunity for profit or loss, and minimal personal investment in work materials. Amazing Care could not have functioned as a business without them. "Under these circumstances, it cannot be said that [LPNs] are in business for themselves." *Brock*, 840 F.2d at 1061. *See also Verma v. 3001 Castor, Inc.*, 937 F.3d 221, 232 (3d Cir. 2019) (finding workers' status "f[ell] well on the 'employee' side of the line" where five of six *Sureway Cleaners* factors weighed in favor of employee status). LPNs are employees.

Overtime Violations

The FLSA provides that no employer shall employ any of its employees for a workweek longer than 40 hours unless those employees receive overtime compensation or are exempt. *See* 29 U.S.C. § 207(a)(2).

The defendants concede that HHAs are employees.[145] As explained above, LPNs are employees as a matter of law. The defendants were thus obligated to pay HHAs and LPNs overtime wages for work in excess of 40 hours per week.

Kear testified in January 2025 that Amazing Care had been paying its HHAs and LPNs overtime wages since the DOL investigation began in 2021.[146] But, Mamulashvili's

---

[145] *See* Defs.' COF 5 n.3.

[146] *See* Kear Dep. 69:14–21, 70:11–19. As noted previously, Kear also testified that Amazing Care started paying its W-2 workers overtime in either 2019 or 2020. *See id.* 64:2–10. The DOL investigation began around July 2021. *See* Mamulashvili Dep. 27:2–13. Either way, according to Kear's testimony, Amazing Care began paying both HHAs and LPNs overtime years ago, and was still paying them overtime as recently as January 14, 2025, when he was deposed.

declaration and Amazing Care's pay records show that from July 13, 2020 through December 27, 2024, 284 individuals who worked as HHAs or LPNs were not paid overtime wages.[147]   Though the defendants do not dispute that evidence in their briefing, Kear's testimony nonetheless establishes a material dispute as to whether Amazing Care started paying workers overtime after the DOL investigation and has continued to do so. Therefore, although we find that the defendants were obligated to pay HHAs and LPNs overtime wages, disputes remain as to whether HHAs or LPNs were denied overtime pay at any point during the actionable period.  Those disputes must be resolved by the jury.

Injunctive Relief

The parties dispute whether injunctive relief is warranted as to the overtime claim. A district court may restrain future FLSA violations upon a showing of cause.  *See* 29 U.S.C. § 217. The court considers the employer's past and current conduct, and the expectation that the employer will comply with the FLSA in the future. *Mosluoglu*, 2023 WL 3440237, at *15 (citing *Solis*, 934 F. Supp. 2d at 815).

In *Su v. Nursing Home Care Management*, the district court granted injunctive relief against a nursing home for FLSA violations where the defendant's past practices violated Sections 7(a) and 11(c), and its current practices "continue[d] to violate" those provisions. No. 21-cv-02583, 2023 WL 3440237, at *15 (E.D. Pa. May 12, 2023) (Kenney, J.).  The court observed that the defendants "ha[d] not changed their pay practices since the start of th[e] [DOL] investigation" that led to the lawsuit.  *See id.* at *15.  Because the record showed that the defendant had committed FLSA violations prior to being investigated by the DOL and continued to commit those same violations after the investigation and up

---

[147] *See* Mamulashvili Decl. ¶¶ 6–7; Payroll Summary; Revised Schedule A.

through litigation, there was no reason to believe that the defendant would stop committing the violations.  *See id.*  Accordingly, the court granted an injunction.

As explained previously, the record does not definitively establish when—if ever—the defendants began paying HHAs and LPNs overtime wages.  Nor does it show what Amazing Care's current practices as to overtime are.  Without resolving those issues, we cannot grant summary judgment and issue an injunction.

Recordkeeping Violations

Under Section 11(c) of the FLSA, covered employers must "make, keep, and preserve" records of their employees' "wages, hours, and other conditions and practices of employment."  29 U.S.C. § 211(a), (c).  The records must include the day and time of the start of the workweek, total weekly straight-time earnings, total weekly overtime premium pay, total additions to or deductions from wages, total wages paid each pay period, and date of payment and period covered by payment.  *See* 29 C.F.R. § 516.2.  Employers must also preserve "all basic time and earning cards or sheets on which are entered the daily starting and stopping time of individuals" for two years from the date of last entry.  *See id.* § 516.6.

The DOL charges that the defendants did not keep required records of employees' overtime hours under Section 11(c) of the FLSA and federal regulations.  *See id.* §§ 516(a)(7)–(8).  It alleges that the records "do not reflect premium pay for overtime hours for employees who worked overtime and were misclassified by [the] [d]efendants as independent contractors," and "do not reflect daily or weekly straight-time earnings or wages earned, instead reflecting only biweekly earnings."[148]

---

[148] *See* Pl.'s Br. 13.

The defendants do not deny that the pay records fail to document overtime pay or daily and weekly straight-time earnings. They merely offer that the information in the records was accurate, and that Kear and Kilipko cooperated throughout the DOL investigation.[149]  It is not the accuracy of what was reported or the defendants' cooperation that is at issue. It is what is not in the payroll records. There is no dispute that the missing information is required by the FLSA.[150]

Where there is no dispute of material fact, summary judgment can be granted as to liability on an FLSA recordkeeping claim. *See Sec'y U.S. Dep't of Lab. v. Nursing Home Care Mgmt. Inc.*, 128 F.4th 146, 160 (3d Cir. 2025). The record is sufficient to rule on liability here. The defendants do not dispute that they violated the recordkeeping requirement. Therefore, the DOL is entitled to summary judgment on the recordkeeping claim to the extent Amazing Care failed to document workers' earnings as required.

Liquidated Damages

When an employer violates the FLSA's overtime provisions, the FLSA provides for payment of unpaid wages and the equivalent amount in mandatory liquidated damages. *See* 29 U.S.C. § 216(b).

A violation need not be intentional to warrant liquidated damages. *Williams v. Tri-Cnty. Growers, Inc.*, 747 F.2d 121, 129 (3d Cir. 1984). Because liquidated damages are compensatory rather than punitive, they are presumed. *See Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 907 (3d Cir. 1991).

---

[149] *See* Defs.' Opp'n 24.

[150] The defendants contend that "the record reflects compliance with the FLSA post-lawsuit filing," *see id.* at 24, but do not cite any post-lawsuit payroll documents that include the information required under the FLSA, and we find none in the record.

A court may relieve a defendant from liability for liquidated damages. 29 U.S.C. § 260; *Sec'y U.S. Dep't of Lab. v. Am. Future Sys., Inc.*, 873 F.3d 420, 433 (3d Cir. 2017). To obtain that discretionary relief, a defendant must show that (1) the act or omission giving rise to the action was done in good faith; and (2) the employer had reasonable grounds for believing that its act or omission was not a violation of the FLSA. 29 U.S.C. § 260; *Am. Future Sys., Inc.*, 873 F.3d at 433.

Whether an employer who violated the FLSA acted in good faith is a subjective inquiry requiring a showing that the employer had "an honest intention to ascertain and follow the dictates" of the FLSA. *Am. Future Sys., Inc.*, 873 F.3d at 433. The employer must also demonstrate that it had reasonable grounds for believing its conduct conformed to the statute. *Marshall v. Brunner*, 668 F.2d 748, 753 (3d Cir. 1982).

Reasonableness is an objective standard. The employer must act "as a reasonably prudent" person would under the circumstances. *Brooks v. Vill. of Ridgefield Park*, 185 F.3d 130, 137 (3d Cir. 1999) (quoting *Addison v. Huron Stevedoring Corp.,* 204 F.2d 88, 92 (2d Cir. 1953)). Merely proving that the employer did not act intentionally or had good intentions does not preclude liquidated damages. *Tri-Cnty. Growers, Inc.*, 747 F.2d at 129. Ignorance of the law is insufficient. *Brooks*, 185 F.3d at 137.

Kear and Kilipko offer "many reasons why there was an absence of bad faith."[151] They emphasize that they had not been involved in litigation prior to this suit or contacted by the DOL prior to its investigation. They contend that it was not "obvious or common knowledge that everyone in home health care is entitled to overtime," in part because the

---

[151] *Id.* at 20 (emphasis removed).

FLSA did not require home health companies to pay overtime until 2016.[152]  Kear and Kilipko also imply their status as immigrants explains their lack of familiarity with the FLSA.[153]  Additionally, during his twelve years working for a U.S. home healthcare company prior to founding Amazing Care, Kear was never paid overtime.[154]  He believed that "many companies" similar to Amazing Care do not pay overtime.[155]  The defendants note that Kear "still isn't clear" why LPNs might not be considered independent contractors.[156]  Finally, they cite their cooperation throughout the DOL's investigation as evidence that none of the alleged FLSA violations were made in bad faith.

This evidence may show an absence of bad faith, but it does not establish good faith.  Kear and Kilipko never endeavored to understand their FLSA obligations regarding overtime pay despite knowing that at least some workers may be entitled to it.[157]  Their argument that their job experience and immigrant status impaired their ability to know what the FLSA required fails.  Again, ignorance of the law is not a defense.  *See Brooks*, 185 F.3d at 137.

What matters is whether the defendants acted reasonably.  *Id.*  A reasonable employer familiar with the concept of overtime pay and whose employee handbook promised overtime pay to eligible employees would have made an attempt to ascertain its overtime obligations.  Kear testified that workers' reclassification was done, in part, to

---

[152] *Id.* at 19–20 (emphasis removed).

[153] *See id.* at 27.

[154] *See* Defs.' COF ¶ 27.

[155] *See id.*

[156] *See id.* ¶ 29 (emphasis removed) (citing Kear Dep. 67:2–19).

[157] *See* Kear Dep. 66:25–67:3, 82:19–85:7; Kilipko Dep. 83:9–24, 91:24–92:15.

avoid paying overtime.[158]  That testimony alone precludes finding that the failure to pay employees overtime was in good faith.  To the extent the defendants are liable for overtime violations, liquidated damages are warranted.

Willfulness

The statutory lookback period for FLSA claims is two years for non-willful violations and three years for willful violations.  29 U.S.C. § 255(a).  The burden of showing willfulness is on the DOL.  *See Nursing Home Care Mgmt., Inc.*, 128 F.4th at 158. The defendants argue that the two-year statutory lookback period applies because the DOL has not established the defendants' alleged FLSA violations were willful.[159]

A violation is willful if the employer either knows or shows reckless disregard for whether its conduct violates the FLSA.  *Id.* at 158–59 (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).  The plaintiff must establish that the defendant had "actual notice of the requirements of the FLSA" and proceeded to violate them anyway.  *See id.* (quoting *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 967 (6th Cir. 1991)).  Showing the conduct was merely "unreasonable" is insufficient, *Souryavong v. Lackawanna Cnty.*, 872 F.3d 122, 126 (3d Cir. 2017) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)), but a showing of "egregiousness" is not required, *Stone v. Troy Constr., LLC*, 935 F.3d 141, 150 (3d Cir. 2019).  Willfulness turns on whether the defendants had actual notice of the FLSA's requirements prior to violating the statute.  *See Nursing Home*

---

[158] *See* Kear Dep. 82:7–83:2 (testifying that Amazing Care "did not have the money saved to pay people, like, all of this time of 40 hours of overtime and also . . . pay the wage," so it "stopped").

[159] *See* Defs.' Opp'n 25–27.  Under the parties' tolling agreement, the parties agreed that the lawsuit is "deemed to have been filed 187 days prior to the actual filing date."  *See* Statute of Limitations Tolling Agreement (attached as Ex. G to Defs.' Opp'n) ¶ 4, ECF No. 45-1 (emphasis removed).  This lawsuit was filed on January 16, 2024.  *See* Compl. at 6.  The lookback period, be it two or three years, is therefore calculated back from July 13, 2023.  The defendants' assertion that the lookback period should be calculated from July 14, 2023, *see* Defs.' Opp'n 25, is inaccurate.

35

*Care Mgmt.*, 128 F.4th at 159.  Whether they were actually aware that workers should have been paid overtime wages is a question of fact.

The DOL contends that the reclassification of workers was a deliberate attempt to avoid paying overtime.  Kear and Kilipko each testified that they knew before joining Amazing Care that employees are entitled to overtime pay.[160]  Kear even conceded that Amazing Care intentionally reclassified workers to avoid paying overtime.[161]  But, he denied knowing doing so was illegal.[162]  Kilipko similarly testified that she "didn't even know there's a law" governing overtime.[163]

Kear and Kilipko's claimed ignorance of their legal obligations is contradicted by Amazing Care's employee handbook, which advises that non-exempt employees who work over 40 hours a week are, under federal law, owed overtime.[164]  Kear and Kilipko testified that they were familiar with the handbook's contents.[165]  That would have put them on notice of their legal requirement to pay qualifying workers overtime wages.  Nevertheless, neither Kear nor Kilipko sought advice of counsel or information from any other source to ascertain their legal obligations before denying workers overtime pay.[166]

Whether or not they sought it, the defendants were given advice by ACHC regarding classifying workers. The decision to treat LPNs as independent contractors beginning in May 2019 was driven by AHCH's recommendation that Amazing Care divide

---

[160] Kear Dep. 83:24-84:21; Kilipko Dep. 83:9–24.

[161] Kear Dep. 82:3–83:2.

[162] *Id.* 66:25–67:19.

[163] *See* Kilipko Dep. 92:2–15.

[164] *See* Employee Handbook (attached as Ex. E to Pl.'s Br.) 10, ECF No. 41-8; Kear Dep. 46:25–51:9.

[165] *See* Kear Dep. 47:2–7; Kilipko Dep. 59:6–18.

[166] Kear Dep. 66:25–67:3, 82:19–83:2, 85:2–7; Kilipko Dep. 91:24–92:15.

its workers into W-2 employees and 1099 contractors.[167]   Kear testified that the reclassification was a suggestion,[168] while Kilipko testified that ACHC framed it as a change Amazing Care "ha[d] to" implement.[169]  A reasonable jury could find that ACHC's influence, whether a suggestion or a directive, reasonably could have led Kear and Kilipko to believe they could lawfully classify some of their workers as independent contractors. As explained above, their lack of attempt to confirm their legal duties precludes a finding of good faith.  But, their reliance on ACHC's advice creates an issue of fact as to whether they knew their conduct was illegal.  Consequently, we cannot conclude as a matter of law that the violations at issue were willful.  That determination is for the jury.

Unpaid Overtime Wages

Where an employer has not kept adequate records of its employees' wages and hours as required under the FLSA, the DOL may submit evidence from which the amount of unpaid wages "may be reasonably inferred." *Sec'y U.S. Dep't of Lab. v. Cent. Laundry, Inc.*, 790 F. App'x 368, 372 (3d Cir. 2019) (quoting *Martin v. Selker Bros.*, 949 F.2d 1286, 1296–97 (3d Cir. 1991)).  While calculations cannot be based on "mere speculation," *see id.* (quoting *Rosano v. Twp. of Teaneck*, 754 F.3d 177, 189 (3d Cir. 2014)), "'imprecision[s]' arising from recordkeeping failures do not defeat recovery," *id.* (quoting *Martin*, 949 F.2d at 1297).  Once the DOL has submitted evidence "from which a fact finder may reasonably infer the amounts due," the burden shifts to the employer to present "evidence of the precise amount of earnings received and work performed" or "evidence to negate the district court's reasonable inferences" drawn from the DOL's evidence. *See*

---

[167] *See id.* 62:16–22.

[168] *See* Kear Dep. 63:1–8, 65:12–13.

[169] *See* Kilipko Dep. 84:21–23.

*id.* (quoting *Martin*, 949 F.2d at 1297).

The DOL, relying on the defendants' records of HHAs' and LPNs' work hours, asserts that Amazing Care workers are owed $5,919,096.34 in unpaid overtime wages earned from July 13, 2020 through December 27, 2024.[170]  The defendants do not dispute the facts underlying the DOL's calculations.  Rather, they contend the DOL did not "show its work" and its math is wrong.[171]

There is insufficient evidence to determine the amount of damages.  Thus, we cannot enter judgment based on the DOL's calculation of damages.

## Conclusion

The DOL's motion for summary judgment will be granted in part and denied in part.  The undisputed facts establish that Amazing Care is a covered entity under the FLSA; Kear and Kilipko are "employers" subject to individual liability; HHAs and LPNs are "employees"; the defendants violated Section 11(c) recordkeeping requirements; and liquidated damages are warranted under Section 16(c).  Material factual disputes preclude summary judgment as to whether the defendants violated Section 7 overtime requirements, injunctive relief is warranted, and the alleged violations were willful.  The amount owed HHAs and LPNs in back overtime wages is also disputed.  Those disputes must be resolved by the jury.

---

[170] Pl.'s Br. 17–18; Mamulashvili Decl. ¶ 8.

[171] *See* Defs' SUMF ¶¶ 20–24.